UNITED STATES ex rel. WILLIAMS v. SEUFERT BROS. CO.

(District Court, D. Oregon. May 1, 1916.)

No. 6766.

1. INDIANS ☞3—CONSTRUCTION OF TREATY—FISHING RIGHTS.

In 1855 the United States concluded treaties with the different Indian Tribes occupying the territory now comprising the states of Washington and Oregon, by which it sought to extinguish their title to all the land in such territory excepting that included within the reservations therein delimited. The boundaries between the lands claimed by the different tribes were indefinite, and those fixed by the treaties were more or less arbitrary. The tract ceded by the Yakima tribes by the treaty of June 9, 1855 (12 Stat. 951), was bounded on the south by the Columbia river. Such treaty reserved to the Indians the right of taking fish "at all usual and accustomed places in common with the citizens of the territory." *Held*, that such provision should not be construed as limited in its application to places within the boundaries of the land ceded, and that the right thereby secured to the Indians extended to their usual and accustomed fishing places on the south side of the Columbia river.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 5–7, 11; Dec. Dig. ☞3.]

2. TREATIES ☞7—RULES OF CONSTRUCTION.

Treaties, like contracts, must be construed as a whole to ascertain their true meaning and intendment.

[Ed. Note.—For other cases, see Treaties, Cent. Dig. § 7; Dec. Dig. ☞7.]

3. INDIANS ☞3—TREATIES—RULES OF CONSTRUCTION.

A treaty with Indians should be construed as nearly as may be ascertained as the Indians understood it, and they should be given the benefit of any doubt as to the meaning of its provisions.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 5–7, 11; Dec. Dig. ☞3.]

4. INDIANS ☞6—STATUS—TERMINATION OF GOVERNMENT GUARDIANSHIP.

An Indian who, although he received an allotment on a reservation which he still holds, has ceased to live on the reservation, has acquired a

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

homestead on which he resides, and has adopted the habits of civilized life and become a citizen by virtue of Act Feb. 8, 1887, c. 119, § 6, 24 Stat. 390, is no longer a ward of the government in such sense that the United States may maintain a suit to protect fishing right claimed by him under a treaty with the tribe of which he was a member.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 12; Dec. Dig. ⊙⇒6.]

5. INDIANS ⊙⇒3—TREATIES—FISHING RIGHTS.

Indians, given by treaty the right of taking fish at all usual and accustomed places, are not limited in fishing at such places to methods used by them in times before the treaty, but may adopt and use any modern method.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 5–7, 11; Dec. Dig. ⊙⇒3.]

In Equity. Suit by the United States, as trustee and guardian of the Confederated Tribes and Bands of Yakima Indians and as trustee and guardian of and on the relation of Sam Williams, against Seufert Brothers Company. Decree for complainant as guardian of Yakima Tribes, and dismissed as to relator Williams.

Clarence L. Reames, U. S. Atty., and Robert R. Rankin, Asst. U. S. Atty., both of Portland, Or.

R. R. Butler and Bennett & Galloway, all of The Dalles, Or., for defendant.

WOLVERTON, District Judge. [1] This is a suit first instituted by the United States of America, on the relation of Sam Williams, against Seufert Bros. Company, a corporation, to establish ancient fishing rights at a place described as:

"That certain portion of the rocks which, at low water, constitute the south bank of the Columbia river opposite lot No. 3, in section 36, township No. 2, north of range 13, east of the Willamette Meridian, in the county of Wasco, state of Oregon."

By leave of the court first had and obtained, the bill of complaint was amended so as to make the United States of America, as trustee and guardian of the confederated tribes and bands of Yakima Indians, and as trustee and guardian of and ex rel. Sam Williams, plaintiff, against Seufert Bros. Company, a corporation, defendant. Being so amended, the further allegations with reference to the locus in quo of the fishing ground are as follows:

"With the increased commercial fishing on the Columbia river, the places for the Indian fishing became very confined and narrowed in their limits, and a particular fishing place now claimed by this plaintiff in the behalf and for the benefit of the Yakima Nation of Indians and the most recent and consistent user, Sam Williams, is particularly described as follows, to wit: That certain point situated 28.53 chains north and 12 chains west of the quarter section corner between section 1, in township 1, and section 36 in township 2, both townships north of range 13 east of the Willamette Meridian in the county of Wasco, state and district of Oregon.

"Said place is further identified as the usual place where Sam Williams, as a Yakima Indian, was accustomed to fish with dip net and scow fish wheel for several years last past, and where this Indian has driven iron pins in the

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

rocks to which to anchor his scow fish wheel to the south bank of the Columbia river, and where the letter and figures 'O 34' are marked on the rocks, the same being the number of the fishing license issued by the state of Oregon to Sam Williams for the fishing season of the year 1913.

"This fishing place, as in this paragraph generally and particularly described, was, at the time of said treaty, always has been, and now is, one of the usual and accustomed places to which Indians belonging to one or more of the confederated tribes and bands of Indians of the Yakima Nation have continually resorted for the purpose of securing fish, and which place was secured to them for their use and benefit, and which place said tribes and bands of Yakima and their Indian representatives have fished according to their customs and by more civilized methods except when prevented by high water, by the construction work of the United States government in widening the channel of the Columbia river at this point, or by the threats and acts of the defendant company, its officers, agents, and employés, as hereinafter particularly set forth and complained of."

Under the testimony, the locus in quo was considerably extended so as to comprise the entire point known by the Indian tribes as Kum-sucks, reaching from below the point where Sam Williams had his wheel set in the years 1910, 1911, 1912, and 1913, and where he attempted to maintain it in the year 1914 as against the claim of the defendant company, around the point up the river to and even beyond a point where Henry Gulick or his wife claims to own and possess, including the location where Peter Jackson, an Indian, has for a time and does now maintain a fish wheel. The description is perhaps broad enough to suggest an inquiry as to the ancient fishing rights of the confederated tribes of the Yakima Indians to the entire point known as Kum-sucks, whether it be immediately at the point or for a stretch around and below or around and above such point. Such, therefore, will be the present inquiry.

To sustain the fishing rights, it is further alleged, in effect, that from time immemorial there have been and now are maintained by the confederated tribes and bands of Yakima Indians now settled upon the Yakima Indian Reservation in the state of Washington usual and accustomed fishing places which, by treaty regulations, belong to such tribes and bands as of right, and to which they "are entitled to resort for the purpose of gathering fish for food and domestic and other uses."

On June 9, 1855 (12 Stat. 951), the general government made and entered into a treaty with the following named confederated tribes and bands of Indians occupying lands in Washington territory, to wit, Yakima, Palouse, Pisquouse, Wenatshapam, Klikatat, Klinquit, Kow-was-sav-ee, Li-ay-was, Skin-pah, Wish-ham, Skyiks, Oche-chotes, Kah-milt-pah, and Se-ap-cat, who, for the purposes of the treaty, were considered as one nation under the name of "Yakima," with Kamaiakun as its head chief.

By article 1 said confederated tribes and bands ceded to the government certain territory specifically described by metes and bounds. Among other courses, the following are prescribed:

"Thence, in a southwesterly direction, to the Columbia river, at the western extremity of the 'Big Island,' between the mouths of the Umatilla river and Butler creek; all which latter boundaries separate the above confederated tribes and bands from the Walla-Walla, Cayuse, and Umatilla tribes and

bands of Indians; thence down the Columbia river to midway between the mouths of White Salmon and Wind rivers; thence along the divide between said rivers to the main ridge of the Cascade Mountains; and thence along said ridge to the place of beginning."

Article 2 reserves from the territory described by article 1 a specific tract for the exclusive use and benefit of such confederated tribes and bands of Indians as an Indian reservation.

By article 3:

"The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with the citizens of the territory, and of erecting temporary buildings for curing them; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land."

By the eighth article said confederated tribes and bands of Indians acknowledged their dependence upon the government of the United States. 2 Kappler's Indian Affairs, Laws and Treaties, 524.

The first and most important question of legal import to be determined is whether, by intendment of the treaty, the usual and accustomed fishing places of any of these confederated tribes or bands of Indians situated on the south bank of the Columbia river opposite the territory ceded, if they had such so situated, were reserved for their use and benefit.

The question depends for its solution entirely upon the construction of the treaty. It is urged with strong persuasion that the government and these tribes of Indians were dealing alone with the territory ceded, and none other, and that, when the right of taking fish at all usual and accustomed fishing places was reserved, reference was had to such fishing places as were comprised by the territorial boundaries of the ceded domain. This would be true, undoubtedly, had the two parties been citizens of equal experience and intelligence, and had the government not been seeking in a sense to encompass the guardianship of these untutored races, where the broadest scope of good faith and fair dealing should always, as in like and similar conditions, be exercised.

[2] Treaties, like contracts, must be taken by their four corners, and construed as a whole, in order to ascertain their true meaning and intendment. Furthermore, it is helpful to put oneself in the place of the contracting parties, and view their situation and surroundings, and read the minds, if possible, that formulated and finally concluded the articles which they have made their own by their signatures.

On the same day that the Yakima treaty was concluded, to wit, June 9, 1855 (12 Stat. 945), the government concluded another treaty with the Walla-Walla, Cayuse, and Umatilla tribes and bands of Indians for ceding territory contiguous in part to the territory ceded by the Yakimas, and containing a like stipulation respecting the right of taking fish "at all other usual and accustomed stations in common with citizens of the United States." 2 Kappler's Indian Affairs, Laws and

Treaties, 521. And a little later, on June 25, 1855 (12 Stat. 963), the government concluded a treaty with the tribes and bands of Indians of Middle Oregon, whereby such Indians ceded to the general government the territory lying to the south of the Columbia river opposite the southern boundary of the lands ceded by the Yakima nations. 2 Kappler's Indian Affairs, Laws and Treaties, 536.

The territory ceded is bounded in part by a description, "commencing in the middle of the Columbia river, at the Cascade Falls," and running thence southerly, etc., to the headwaters of Willow creek; "thence down stream to its junction with the Columbia river; and thence down the channel of the Columbia river to the place of beginning." This treaty contained, also, a stipulation to the effect that the Indians should have the right to take fish "at all other usual and accustomed stations, in common with citizens of the United States."

Other treaties were concluded about the same time, namely, with the Nez Perces and other tribes, ceding lands further to the east as well as further to the west. So that it can readily be seen that the broad purpose of the government was to conclude equitable and lasting treaties, if possible, with all the tribes and bands of Indians in the Northwest, so as to extinguish the Indian title to all the lands in the country not set apart to the Indians for reserves, and to open up the same more fully to general settlement and occupancy. The Indian tribes did not themselves occupy definite territory with fixed and exact boundaries, and it is without doubt that the different tribes commingled more or less, and roamed about, in their hunting and in the chase, over the demesnes one tribe of another. And so of their fishing—there was no monopoly by any one tribe of any specific and fixed territory.

The tribes and bands were very numerous, and it was most convenient to treat with them in groups, as their settlement in definite locations could be agreed upon, and the combined territory of the groups relinquishing title was comprised by one boundary. In this wise, taking them by groups, all the territory was covered by relinquishment of Indian title. The group boundaries were consequently, in many instances at least, made contiguous, and they very naturally only followed in a general way the very general idea that the Indians had of their territorial delimitations.

Now, it cannot be predicated of the Indian mind in those early times that particular stress was laid upon any precise or exact boundary line as a delimitation of ceded territory; nor was it of especial concern to the general government, as its ultimate object was to obtain a cession of the Indian title to all Indian territory, and that within a comparatively short compass of time, so that great emphasis cannot be ascribed to any idea of absolute exactness in establishing the delimitations of ceded territory. It was not a thing, under the conditions then existing and in view of the matters in contemplation, of very great essentiality to either party to the treaties being negotiated. The Indians were giving up all they had for a lesser area, with enlarged rights pertaining thereto, and the government was getting relinquishment of the Indian title to all public lands.

[3] Now, with this premise in view, we may the more confidently discuss the meaning and intendment of the clause "all usual and accustomed places." "All," of course, is a term of very broad significance, and it must be limited by the context and by the understanding that the Indians probably had of it at the time the treaty was consummated. Mr. Justice McKenna, in United States v. Winans, 198 U. S. 371, 380, 25 Sup. Ct. 662, 664 [49 L. Ed. 1089], has made use of this significant language:

"And we have said we will construe a treaty with the Indians as 'that unlettered people' understood it, and 'as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection,' and counterpoise the inequality 'by the superior justice which looks only to the substance of the right without regard to technical rules' "— citing Choctaw Nation v. United States, 119 U. S. 1, 7 Sup. Ct. 75, 30 L. Ed. 306, and Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49.

The clause giving the exclusive right of taking fish in all streams where running through or bordering on the reservation is immediately followed by the words, "as also the right of taking fish at all usual and accustomed places, in common with the citizens of the territory." No particular stress can be laid upon the words "citizens of the territory," as other lands were being ceded out of the same territory by other tribes; and then, by reference to the treaties made with the Walla-Wallas, Cayuses, and Umatillas, and the Central Oregon tribes, it would seem that "citizens of the United States" were probably intended. By the former part of the clause, the right of taking fish was defined by exact limitations, while in the succeeding part the right is extended to all usual and accustomed places. To the Indian mind this would comprise all places where they were wont to take fish. They would not stop to consider any limitation of the territory they were then ceding to the government. It would probably not occur to the Indians that the circumstance of territorial boundary would have anything to do with it, since, to their mind, all such places were being reserved for their benefit anyway. Quite true, some famous chiefs participated in negotiating these treaties; but none of them were trained in the art of drawing contracts, nor were they adepts in the exact use of a language with which they were not familiar. It may well be that they had no intention of depriving themselves of a right to resort to any fishing places where they had previously been wont to fish, and they are in justice and right entitled to the benefit of any doubt on that subject.

The Indians could not be supposed to know the rule of law that the thing excepted or reserved must be out of the thing granted, and hence but little weight must be ascribed to such and like rules in dealing with this unlettered and untutored race of people.

It is true, also, that the limitations of the territory ceded by the Middle Oregon Indians conforms with the boundary of the territory ceded by the Yakima Indians. But this again is referable to the Indian mind for construction, and so it is that the Columbia river as a boundary may not mean as much to them as to the mind of the superior white man.

One of the conditions attending the negotiations of such treaties is the fact, which I deem has been fairly established by the testimony, that the Indians from one side of the river were accustomed to cross to the other side for taking fish, and vice versa, and thus the Indians of either side were accustomed to resort to the usual places of taking fish upon the other side. They intermarried and intermingled freely, and the Indians of one side neither claimed nor asserted any monopoly of the fishing places as against the Indians on the other side of the river, and all, whether from the one side or the other, seem to have had free access and recourse to the fishing places wheresoever located. In the nature of things, all could not fish at the same time, but they came and went as their wants were satisfied. One Indian likened the river to a great table where all the Indians came to partake. It is related especially of the Wish-ham Tribe, though few in number and occupying but small territory on the Washington side, that they spoke the language of the Wascos, that the two tribes intermarried freely and were interrelated, and that they were wont freely to pass from one side of the river to the other, and to take fish at the ancient and usual fishing places upon either side, treating such fishing places at all times as common property or possession, to which all had a right in common to resort. The Wish-ham Tribe, we may be reminded, is one of the contracting parties to the Yakima treaty. So that, taking into view the context of the treaty, the parties contracting, the nature and subject-matter, the conditions existing at the time, and the circumstances attending the negotiations, I am persuaded that, by intendment, the usual and accustomed fishing places on the south side of the Columbia river to which the confederated tribes and bands of Yakima Indians, or portions of them, were wont to resort, were included by its terms.

The next question is one of fact, which is, whether Kum-sucks was a usual and accustomed fishing place for any of the confederated tribes and bands of Yakima Indians entering into the treaty with the general government of June 9, 1855. The testimony on the subject is so voluminous that it is quite out of the question to attempt to review or analyze it. I can do no more than set forth general conclusions.

Many witnesses have testified to the general fact that the Wish-hams and other Indians from the Washington side, including Yakimas, from a very early date came over every year, and from year to year, to fish at Kum-sucks. Kum-sucks has relation to the particular point of rocks from which the Indians fished. Wah-sucks denoted the camping place of the Indians, which was located back and inland of the point of rocks, and both are referred to by the Indian witnesses, sometimes interchangeably. Wah-sucks signifies "lone tree," taking its name from a pine or fir tree which formerly stood near or at the place. Kum-sucks was a somewhat earlier fishing place than others farther up the river, and the Indians would resort to it at the earliest opportunity for catching fish to supply themselves with food.

At the preliminary hearing for an injunction, it was strongly contended that the Indians could not cross the river in the near vicinity because of the turbulency of the stream; but the testimony on the final hearing was of such a character as to dissipate any doubt on the sub-

ject. There was one crossing just above and quite near the point, and two or three others not far above; and besides Indians crossed some distance, even miles above, and came down on the south side of the river to the point, and others were wont to cross at The Dalles and go up the river to reach it.

It is still maintained, however, that the point was not, and never was, a usual and accustomed place for the Indians to fish, and much testimony of a negative character has been adduced to substantiate the position. The testimony, on the other hand, of an affirmative nature, however, persuasively establishes the fact of the existence of a usual and accustomed fishing place at Kum-sucks; and this having due regard for the significance of the terms "usual" and "accustomed." The Wish-hams from the north side fished mostly at the point; and the Skins and some Yakimas and still others were wont to make that a resort for catching fish. They not only fished there regularly and continuously during the fishing seasons, but they camped at Wah-sucks and constructed platforms and houses in which to dry and cure their fish, through this means preparing it for winter use, and in due time the Indians from the north carried away their fish to their habitations upon the other side of the river. The Indians from the south, and especially the Wascos, made the place a rendezvous for fishing, even to the extent of establishing and maintaining for a long space of time an Indian village at Wah-sucks, and to this day some of their huts and habitations still remain. The Indians both from the south and from the north habitually for many years resorted to this place for the purpose of taking fish for food purposes.

I take it that the fact that Kum-sucks was a usual and accustomed fishing place, not only for the South bank Indians but for the North bank Indians as well, and especially for the Wish-hams and Skins and others of the Yakima confederated tribes, has been fairly well established, and so hold.

[4] Another question presented is whether Sam Williams is a ward of the government in the sense that the government is required to or should interpose in his behalf to protect any fishing rights he may have or possess at Kum-sucks.

Williams was born off the Yakima Indian Reservation. His mother was a Cowlitz, and his father a Yakima Indian. He is an allottee (No. 1525) on the reservation, his patent having been issued to him July 10, 1897. He subsequently disposed of a portion of his allotment, the transfer being made through the interposition of the government. The date of this transfer is July 11, 1910. The remainder of the allotment he still holds. He has lived for the last 21 years off the reservation, has taken a homestead, and, as conceded by the government, has become a citizen of the state of Oregon. His allotment was made in pursuance of the general act of Congress of February 8, 1887 (24 Stat. 388), providing for allotments of lands to Indians. By section 6 of this act, upon completion of the allotments and the patenting of the lands, each and every member of the respective bands and tribes of Indians to whom allotment was made was accorded the benefit of and made subject to the laws, both civil and criminal, of the state or terri-

tory in which he might reside.   And it was further provided as follows:

"And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property."     .

In the case entitled Matter of Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848, the Supreme Court declared that an Indian who had received an allotment and been granted his first patent was no longer a ward of the government, but a citizen of the United States and of the state in which he resided, and was without the pale of Indian police regulations on the part of the government.

Williams is not only an allottee, but has voluntarily taken up, within the limits of the United States, his residence separate and apart from any tribe, and has adopted the habits of civilized life.   He is entitled under either or both the conditions of the statute to all the rights, privileges, and immunities of a citizen of the United States, and, being so entitled, is declared to be a citizen of the United States.   As said in the Heff Case, the government is under no perpetual obligation to continue the relationship of guardian and ward, and it may at any time abandon its guardianship and leave the ward to assume and be subject to all the privileges and burdens of one sui juris.

A later statute, namely, the Act of Congress of May 8, 1906, c. 2348, 34 Stat. 182 (Comp. St. 1913, § 4203), has left the impress that Congress believed that it acted hastily in adopting the 1887 statute, and especially since the construction placed upon the latter by the court in the Heff Case.   United States v. Celestine, 215 U. S. 278, 30 Sup. Ct. 93, 54 L. Ed. 195.

The act of 1906 contains an amendment of section 6 of the act of 1887, and extends the same benefits to allottees as the original act; but they do not become effective until the expiration of the trust period. And later in the act it is specifically declared that, until the issuance of fee-simple patents, all allottees to whom trust patents shall "hereafter" be issued shall be subject to the jurisdiction of the United States.   The special declaration is indicative of a careful regard on the part of Congress for the rights previously acquired under the act of 1887 before amendment, and of a purpose not to impair or curtail the benefits received under that act in any way.   So that Williams' rights and immunities acquired by his allotment were not in the least disturbed by the amendatory act.   Being entitled to such immunities, he should not be permitted to disavow any of the benefits accorded him.

But, further than this, Williams has voluntarily separated himself from his tribe (assuming that he became a member of the Yakima confederated tribes by his allotment), and has taken up his abode else-

where, and adopted the habits of civilized life. This he is precluded by his own acts and demeanor to deny, and it is hardly possible to conceive of a condition that would more completely impose upon him the status of a citizen and evidence a more perfect waiver of all dependence for affording him redress upon the government in the capacity of a guardian of one acting under any legal disability. Regarding the situation in which he has placed himself, therefore, it is confidently believed that Williams is not now a ward of the government, much less can he demand the interposition of the government for the protection of any fishing rights that he may now have or may heretofore have had as a tribal Indian allied with the confederated Yakima tribes and bands now settled upon the Yakima Indian Reservation.

That the government still remains Williams' trustee as it relates to the title to his allotment, and any money distribution that he may be entitled to by reason of once having been a member of the Yakima confederated tribes, can have no bearing upon the question as to whether he continues to be a ward of the government.

Another feature of the controversy to be observed is that the testimony falls short of establishing the fact that the place where Williams is seeking to have his wheel located, or its immediate environment, ever was a usual and accustomed fishing place for the Indians of the Yakima confederated tribes. There has been some evidence adduced to the effect that such Indians may have at some time in the past fished at the place but the great mass of evidence indicates that the ancient fishing places extended from the extreme point known as Kum-sucks, perhaps from a point around it somewhat below, thence up stream to and beyond where Jackson's wheel is located.

Of course, Williams must prevail, if at all, by the establishment of an ancient fishing right; for he claims none other, and could not succeed in this suit upon any other hypothesis. Such a right, being reserved by the treaty, is paramount to any subsequent right attempted to be granted by the government, and especially any right which the state might assume to confer. United States v. Winans, supra.

Williams' failure to succeed, however, does not detract from the right of the confederated tribes and bands of Yakima Indians to succeed, for the suit is by the government as their trustee and guardian, as well as the trustee and guardian of Williams, and their success is in no way dependent upon that of Williams.

To be particular, it is my judgment that the right of the Yakima confederated tribes to take fish at Kum-sucks as a usual and accustomed fishing place has been established under the evidence to that part of the south shore or bank of the Columbia river beginning at the furthermost point down stream of the removal of rock at Kum-sucks by the government in constructing the Celilo Canal, and extending thence up stream around the point to where the shore line meets the premises of Henry or Harriet Gulick, including the place where Peter Jackson's wheel is now located. The defendant should be enjoined from exercising any pretended fishing right along or within this space.

The question was also presented whether the Indians were entitled

to employ any other methods for catching fish than they were wont to employ in more primitive times.

[5] Without discussing the subject at length, I see no reason why Indians may not be permitted to advance in the arts and sciences as well as any other people, and, if they can catch their supply of food fish by a more scientific and expeditious method, there exists no good reason why they may not be permitted to do so. Even more, they ought to be encouraged to adopt the more modern and advanced ways of prosecuting their enterprises.

The rights here ascertained and determined, it must be understood, are to be exercised in common with citizens of the United States, as the treaty so provides. How the common privilege is to be exercised is a subject with which we are not now concerned. When the subject arises, there will be found, it is hoped, a way of satisfactory adjustment.

I deem it equitable that neither party should recover costs or disbursements, and the decree will so provide.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes