PEOPLE v. CHOSA.

SAME v. ATTIKONS.

1. GAME—HUNTING—FISHING—STATES.
   Regulation of hunting and fishing is exercise of sovereignty of State.

2. INDIANS—TREATIES—CONSTRUCTION—STATES.
   While Indian treaty is to be construed, not by strict weight of its words but as Indians probably understood it, and with liberality of intendment in their favor, it will not be unduly extended to restrict sovereign power of State in enactment of laws applicable, without discrimination, to all citizens and aliens.

3. COURTS—STATES—TREATIES—CONSTRUCTION.

Treaty being compact of Federal government and superior to Constitution and laws of States (U. S. Const. Art. 6 [2]), construction of treaty by Federal courts is binding on State courts.

4. INDIANS—HUNTING AND FISHING RIGHTS—TREATIES.

Provision in Indian treaties (7 U. S. Stat. p. 592, 10 U. S. Stat. p. 1111) that Indians shall have right to hunt and fish on ceded lands until otherwise ordered by president is limitation of time on exercise of said reserved right and not enlargement of right itself.

5. SAME—SUBJECT TO FISH AND GAME LAWS.

Indians are subject to fish and game laws of State on lands ceded by treaties (7 U. S. Stat. p. 592, 10 U. S. Stat. p. 1111) to same extent as general public.

6. CITIZENS—RIGHTS AND OBLIGATIONS.

When one becomes citizen of United States, he casts off both rights and obligations of his former nationality and takes on those which pertain to other citizens of country.

7. INDIANS—CITIZENS—STATES.

Under act of congress (24 U. S. Stat. p. 390, § 6), Indians who become citizens thereby become subject to State laws, civil and criminal.

8. SAME—TREATIES—STATUTES—RIGHT TO HUNT AND FISH—CRIMINAL LAW.

If exception in said statute, providing that Indians' right to tribal or other property is not impaired by their taking on citizenship, applies to treaty right to hunt and fish on ceded land, it would only preserve that right as private servitude or *profit a prendre,* and would confer no greater privilege of violating State fish and game laws than owner of land would have.

9. SAME—GAME—CRIMINAL LAW.

Indians who had become United States citizens and who violated State game and fish laws were properly convicted.

Error to Baraga; Stone (John G.), J. Submitted October 16, 1930. (Docket Nos. 164, 165, Calendar Nos. 35,165, 35,166.) Decided December 2, 1930.

James J. Chosa and Basil Attikons, Indians, were convicted of violating the fish and game laws. Affirmed.

*Galbraith & McCormack,* for appellants.

*Wilber M. Brucker,* Attorney General, *M. M. Larmonth,* Assistant Attorney General, and *Leo J. Brennan,* Prosecuting Attorney, for the people.

FEAD, J. These cases are consolidated to present the question of the right of Indians, under treaty, to hunt and fish, in violation of the general game laws of the State, on lands ceded by their tribe to the United States.

It is stipulated that defendants are members of the L'Anse band of Chippewa Indians and are entitled to all the treaty rights and privileges of such band; tribal relations of said band still exist, but the members do not live as a tribe and they have adopted the habits of civilized life; the county of Baraga is within the lands ceded by the Chippewa Indians to the United States under the treaties hereafter quoted; the Indians understood the treaties as giving them the right of hunting and fishing within the land therein described; each of the defendants has received an allotment of land from the United States, has voted in Baraga county, and is a registered elector therein; the fishing occurred on Keweenaw Bay, an arm of Lake Superior; and the hunting was on land in Baraga county, not within the present limits of any Indian reservation.

Counsel agree that the following treaty provisions are applicable:

"The Indians stipulate for the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the presi-

dent of the United States, and that the laws of the United States shall be continued in force, in respect to their trade and intercourse with the whites, until otherwise ordered by congress." Treaty of October 4, 1842, art. 2 (7 U. S. Stat. p. 592).

"And such of them as reside in the territory hereby ceded, shall have the right to hunt and fish therein, until otherwise ordered by the president." Treaty of September 30, 1854, art. 11 (10 U. S. Stat. p. 1111).

The reservations have not been revoked by the president or otherwise. Counsel for defendants contend that the treaty of 1837 also is applicable to Baraga county, but the circuit court held otherwise, and, as the reservation therein does not differ materially from those in the later treaties, the point is not important.

The regulation of hunting and fishing is an exercise of the sovereignty of the State. *Geer* v. *Connecticut,* 161 U. S. 519 (16 Sup. Ct. 600). While an Indian treaty is to be construed, not by the strict weight of its words but as the Indians probably understood it, and with liberality of intendment in their favor (*United States* v. *Seuffert Bros. Co.,* 249 U. S. 194 [39 Sup. Ct. 203]), it will not be unduly extended to restrict the sovereign power of the State in enactment of laws applicable, without discrimination, to all citizens and aliens. 38 Cyc. p. 978. It being a compact of the Federal government and superior to the Constitution and laws of the State (U. S. Const. art. 6 [2]), the construction of a treaty by Federal courts is binding on State courts.

In *Ward* v. *Race Horse,* 163 U. S. 504 (16 Sup. Ct. 1076), Race Horse, who retained his tribal relation and resided on a reservation, was convicted of violation of game laws of Wyoming on unoccupied pub-

lic lands of the United States not within a reservation. The treaty, made when Wyoming was a territory, provided that the Indians—

"shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts." Page 507.

The court held that the treaty was abrogated by the act of congress admitting the territory into the Union on the "equal footing" basis, so far as it could be construed to restrict the sovereign power of the State to regulate game, and affirmed conviction.

In *United States* v. *Winans*, 198 U. S. 371 (25 Sup. Ct. 662), suit was brought to enjoin respondent from obstructing Indians in exercising fishing rights and privileges on the Columbia river in the State of Washington, claimed under treaty made when Washington was a territory, and which contained a reservation of the right of "taking fish at all usual and accustomed places in common with citizens of the territory."

The *locus in quo* was land ceded by the Indians in the treaty. Defendant claimed exclusive possession by virtue of ownership and also of license from the State to use fishing wheels, which necessitated exclusive possession where the wheels were located. The court held that the treaty was not abrogated by admission of the territory into the Union on the equal footing basis in that it created a servitude in the land, binding upon private owners, imposed by virtue of the power of the United States appropriate to the object for which it held the territory. But the court said:

"Nor does it restrain the State unreasonably, if at all, in the regulation of the right. It only fixes in the land such easements as enables the right to be exercised." Page 384.

In *Kennedy* v. *Becker*, 241 U. S. 556 (36 Sup. Ct. 705), in which the treaty covered lands in the already established State of New York, the reservation read:

"Also, excepting and reserving to them, the said parties of the first part and their heirs, the privilege of fishing and hunting on the said tract of land hereby intended to be conveyed." Page 562.

The Indians were charged with violation of the fishing laws of the State, were tribal Indians, residing on a reservation, but the offense was committed on other lands within the tract ceded. The court said:

"It has frequently been said that treaties with the Indians should be construed in the sense in which the Indians understood them. But it is idle to suppose that there was any actual anticipation at the time the treaty was made of the conditions now existing to which the legislation in question was addressed. Adopted when game was plentiful—when the cultivation contemplated by the whites was not expected to interfere with its abundance—it can hardly be supposed that the thought of the Indians was concerned with the necessary exercise of inherent power under modern conditions for the preservation of wild life. But the existence of the sovereignty of the State was well understood, and this conception involved all that was necessarily implied in that sovereignty, whether fully appreciated or not. We do not think that it is a proper construction of the reservation in the conveyance to regard it as an attempt either to reserve sovereign

prerogative or so to divide the inherent power of preservation as to make its competent exercise impossible. Rather are we of the opinion that the clause is fully satisfied by considering it a reservation of a privilege of fishing and hunting upon the granted lands in common with the grantees, and others to whom the privilege might be extended, but subject nevertheless to that necessary power of appropriate regulation, as to all those privileged, which inhered in the sovereignty of the State over the lands where the privilege was exercised.'' Page 563.

These cases are conclusive on the effect of the treaties at bar. The treaties evidently established a servitude of the right to hunt and fish on the ceded land in favor of the Indians and against the exclusive dominion of private ownership, but they provided no immunity from operation of game laws, as against the State.

Defendants argue, however, as distinguishing the instant treaties, that, because they contain a specific condition of enjoyment of the reservation, the pleasure and order of the President, all other conditions are impliedly excluded. Without this special provision, the right reserved would have been perpetual. The provision is a limitation of time on the exercise of the reserved right, not an enlargement of the right itself. As a limitation, it is consistent with the purpose of the treaty, to cede land for ultimate settlement and private ownership, by providing for discharge of the servitude when conditions require it. As a restriction on operation of State game laws, it would be foreign to our system of government in providing control of sovereign powers of the State by an officer of another sovereignty. It must, therefore, be held that defendants are subject to the game laws of the State, on the lands covered

by the treaties, to the same extent as the general public.

This ruling is sustained by another consideration advanced by the people.

Act of congress of February 8, 1887, 24 U. S. Stat. p. 390, § 6 (8 USCA § 3; 25 USCA § 349), provides:

"That upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the State or territory in which they may reside; and no territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law. And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life (and every Indian in Indian Territory), is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property."

The statute is plain and has been given effect according to its terms. An Indian, so taking an allotment, ceases to be a ward of the Federal government (*United States* v. *Seuffert Bros. Co.*, 233 Fed. 579); the police laws of the United States affecting

Indians do not longer apply to him (*Matter of Heff*, 197 U. S. 488 [25 Sup. Ct. 506]); when the statutory restriction on alienation of his property is removed, State laws govern its transfer, fix the age of majority, and declare the disability of minors (*Dickson* v. *Luck Land Co.*, 242 U. S. 371 [37 Sup. Ct. 167]); and State laws control the taxation of his property, its levy and sale for taxes, and his right to alienate voluntarily or involuntarily. *Goudy* v. *Meath*, 203 U. S. 146 (27 Sup. Ct. 48).

When one becomes a citizen of the United States, he casts off both the rights and obligations of his former nationality and takes on those which pertain to other citizens of the country. 11 C. J. p. 786.

Both because of the new citizenship and by the express terms of the statute under which the allotments were made, defendants became subject to the laws of the State, civil and criminal. Assuming, but not deciding, that the statutory exception, that their right to tribal or other property is not impaired by taking on American citizenship, applies to the treaty right to hunt and fish on the ceded land, it would only preserve that right as a private servitude or *profit a prendre,* and would confer no greater privilege of violating State laws than the owner of the land would have.

The convictions are affirmed.

WIEST, C. J., and BUTZEL, CLARK, MCDONALD, POTTER, SHARPE, and NORTH, JJ., concurred.