PEOPLE v. JONDREAU

OPINION OF THE COURT

1. TREATIES—INDIANS—STATUTES—STATE REGULATIONS—CONSTITU-
TIONAL LAW.

Michigan Supreme Court Judges, as judges of a state court, are
bound, under the United States Constitution, by the Chippewa
Indian Treaty of 1854, and, to the extent that any state law
or regulation conflicts with the treaty, the state law or regu-
lation is invalid (US Const, art 6; 10 Stat 1109 [1854]).

2. TREATIES—CONSTRUCTION—INDIANS.

The language used in treaties with the Indians should never be
construed to their prejudice; how the words of the treaty were
understood by these unlettered people, rather than their critical
meaning, should form the rule of construction.

3. TREATIES—CONSTRUCTION—INDIANS—FISHING.

The substance of the right to fish, in the Chippewa Indian Treaty
of 1854, must have included the right to fish on the Keweenaw
Bay, as it was clearly a valuable right and any other construc-
tion of the treaty would make the right granted by the treaty
without substance; the Indians did not have knowledge of the
laws concerning municipal boundaries or sovereignty disputes
between the Federal and state governments and, since they
were living on land bordering that bay, as "unlettered people"
they would assume that the right to fish meant the right to
fish on that bay (10 Stat 1109 [1854]).

4. TREATIES—PRESIDENT—STATES.

Under the treaty power, the President may make determinations
that affect the power normally reserved to the state (US
Const, Am 2).

REFERENCES FOR POINTS IN HEADNOTES
[1, 4–6] 52 Am Jur, Treaties § 18.
[2] 41 Am Jur 2d, Indians § 12.
[3] 41 Am Jur 2d, Indians § 19.

CONCURRING OPINION
BLACK, J.

5. TREATIES—CONSTITUTIONAL LAW—COURTS.

*The supremacy clause of the United States Constitution which says imperatively that "all Treaties made"—along with the other components therein listed—"shall be the supreme Law of the Land" and which provides "the Judges in every State" shall be bound thereby is binding upon the Michigan Supreme Court (US Const, art 6[2]).*

6. TREATIES—INDIANS—CONSTITUTIONAL LAW—STATE INTERESTS—PRIOR DECISION.

*It was something more than judicial error, it was pure nullity, for the Michigan Supreme Court to have previously attempted, in contravention of the Chippewa Indian Treaty of 1854 and the supremacy clause of the United States Constitution to interpose subordinate interests of the state, and the never exercised revocatory power of the President, to block the enforcement of that treaty (US Const, art 6; 10 Stat 1109 [1854]).*

Appeal from Court of Appeals, Division 3, T. G. Kavanagh, P. J., and McGregor and Elliott, JJ., affirming Baraga, Stephen D. Condon, J. Submitted January 7, 1971. (No. 12 January Term 1971, Docket No. 52,319.) Decided April 5, 1971. Rehearing denied August 30, 1971.

15 Mich App 169 reversed.

William Jondreau was convicted of illegal possession of lake trout. Defendant appealed to the Court of Appeals. Affirmed. Defendant appeals. Reversed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Jerome Maslowski* and *Curtis G. Beck,* Assistant Attorneys General, for the people.

*Wisti & Jaaskelainen* (by *John M. McCarthy*), for defendant.

SWAINSON, J.   William Jondreau is a full-blooded Chippewa Indian, living on the L'Anse Indian Reservation, and a member of the tribal council of that reservation.

On June 1, 1965, he was observed by an officer of the Michigan Department of Conservation to be fishing in the waters of the Keweenaw Bay on Lake Superior.  When he came into shore, he was arrested for the illegal possession of four lake trout taken from the Keweenaw Bay.[1]  He was convicted of this offense in both the Baraga village justice court and in the Circuit Court of Baraga County.  The Court of Appeals affirmed his conviction (15 Mich App 169) on the authority of *People* v. *Chosa* (1930), 252 Mich 154.  We granted leave to appeal, 381 Mich 808.

The issues involved are extremely complex.  They concern the interrelationship of the power of the Federal government to make treaties with the Indian tribes and the right of the state to set up nondiscriminatory game regulations.  Both parties have raised several issues which may be summarized as follows:

Whether the Chippewa Indian Treaty of 1854 (10 Stat 1109 [1854]) gives the defendant, William Jondreau, the right to fish on Keweenaw Bay without regard to state fishing regulations?

## *I.*

The interpretation of Indian treaties by the courts has varied greatly depending upon the precise wording of the treaties.  Hence, a close examination of the treaty involved in this case is imperative.

---

[1] The possession of trout out of season has been made illegal pursuant to a State Conservation Commission order promulgated under authority of MCLA § 308.201 (Stat Ann 1967 Rev § 13.1568 [1]).

Under the Chippewa Treaty of 1854, the Federal government agreed under Article 2:

"1st. For the L'Anse and Vieux De Sert bands, all the unsold lands in the following townships in the State of Michigan: Township fifty-one north range thirty-three west; township fifty-one north range thirty-two west; the east half of township fifty north range thirty-three west; the west half of township fifty-north range thirty-two west; and all of township fifty-one north range thirty-one west, lying west of Huron Bay."

Article 11 of the treaty states:

" * * * And such of them as reside in the territory hereby ceded shall have the right to hunt and fish therein, until otherwise ordered by the President."

When Mr. Jondreau came ashore on June 1, 1965, he alleged he was within T 51 N, R 33 W. If a line were extended from the boundaries into the Bay, the area where he was fishing would have been within T 51 N, R 33 W. The people correctly contend that under Michigan law the boundaries of the township do not extend into the Great Lakes. *People* v. *Bouchard* (1890), 82 Mich 156. Thus, they assert, that Jondreau was not within T 51 N, R 33 W. They further assert that title to the waters and submerged lands in the Great Lakes vested in the State of Michigan when it became a State in 1837. Thus, they contend, that the Indians did not have title to the waters and submerged lands and, therefore, could not cede them to the United States government.

Defendant contends that the title to the waters and submerged lands did not pass to the State of Michigan in 1837 and, thus, were part of the ceded land under the treaty.

Both parties have done an excellent job of discussing in detail the numerous United States Su-

preme Court cases involving title to submerged lands, beginning with *Martin* v. *Waddell* (1842), 41 US (16 Peters) 367 (10 L Ed 997), and ending with *United States* v. *California* (1947), 332 US 19 (67 S Ct 1658, 91 L Ed 1889). However, after a thorough analysis of these cases, we believe that the interpretation of the treaty does not depend on the title to the waters and submerged lands of Keweenaw Bay. Hence, we will not discuss the question of title to these lands and waters.

Under Article 2, § 2, of the United States Constitution, the President has the power to make treaties, provided that two-thirds of the Senate concur. This, of course, was the procedure that was followed when the Chippewa Indian Treaty of 1854 was made.

Article 6 of the United States Constitution states in part:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."[2]

Thus, as Judges of a state court, we are bound by this Chippewa Indian Treaty of 1854, and, to the extent that any state law or regulation conflicts with the treaty, the state law or regulation is invalid. We, therefore, must determine what was meant by the statement in the treaty "and such of them as reside in the territory hereby ceded shall have the right to hunt and fish therein, until otherwise ordered by the President."

---

[2] See, *e.g.*, *Whitney* v. *Robertson* (1888), 124 US 190 (8 S Ct 456, 31 L Ed 386), and *Cooper* v. *Aaron* (1958), 358 US 1 (78 S Ct 1401, 3 L Ed 2d 5).

Although there is no legislative history available on the making of this treaty, we are aided by the fact that the United States Supreme Court has laid down general rules of construction in cases involving Indian treaties. In *Worcester* v. *Georgia* (1832), 31 US (6 Peters) 515 (8 L Ed 483), Justice McLean stated (p 582):

"The language used in treaties with the Indians should never be construed to their prejudice. * * * How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction."

In *Choctaw Nation* v. *United States* (1886), 119 US 1 (7 S Ct 75, 30 L Ed 306), after quoting the above statement, the court said (p 28):

"The parties are not on an equal footing, and that inequality is to be made good by the superior justice which looks only to the *substance of the right,* without regard to technical rules framed under a system of municipal jurisprudence, formulating the rights and obligations of private persons, equally subject to the same laws." (Emphasis added.)

See, also, *Jones* v. *Meehan* (1899), 175 US 1 (20 S Ct 1, 44 L Ed 49); *United States* v. *Winans* (1905), 198 US 371, 380, 381 (25 S Ct 662, 49 L Ed 1089); *Kennedy* v. *Becker* (1916), 241 US 556, 563 (36 S Ct 705, 60 L Ed 1166); and *Menominee Tribe* v. *United States* (1968), 391 US 404, 406 (fn 2) (88 S Ct 1705, 20 L Ed 2d 697).

The substance of the right to fish must have included the right to fish on the Keweenaw Bay. For the L'Anse band of Chippewa Indians (See Map, Appendix A), the fishing right on the Keweenaw Bay was clearly a valuable right. Any other construction of the treaty would make the right granted by the treaty without substance. The Indians did

not have knowledge of the laws concerning munici-
pal boundaries or sovereignty disputes between the
Federal and state governments. Since they were
living on land bordering the Keweenaw Bay, as
"an unlettered people" they would assume that the
right to fish meant the right to fish on the Keweenaw
Bay.

## II.

In the case of *Worcester* v. *Georgia, supra,* where
the court struck down a state law which attempted
to regulate certain actions of white persons and
Indians, Chief Justice Marshall stated (p 561):

"The *whole intercourse* between the United States
and this [Indian] nation, is, by our constitution
and laws, *vested in the government of the United
States."* (Emphasis added.)

Following this case, the courts retreated from this
position for almost a century. State laws which
limited the rights of Indians under the various
treaties were upheld as valid exercises of the police
power. However, in recent years, the courts have
again accorded Indians full rights under the treaties.
Thus, while the court stated in *Ward* v. *Race Horse*
(1896), 163 US 504, 507, 509, 513 (16 S Ct 1076,
41 L Ed 244):

"The power of a State to control and regulate
the taking of game cannot be questioned. * * *
To suppose that the words of the treaty intended to
give to the Indian the right to enter into already
established States and seek out every portion of
unoccupied government land and there exercise the
right of hunting, in violation of the municipal law,
would be to presume that the treaty was so drawn
as to frustrate the very object it had in view.
* * * 'the States have full power to regulate
within their limits matters of internal police
* * * .'"

and in *Kennedy* v. *Becker* (1916), 241 US 556 (36 S Ct 705, 60 L Ed 1166) (pp 563, 564):

" * * * we [are] of the opinion that the clause is fully satisfied by considering it a reservation of a privilege of fishing and hunting upon the granted lands in common with the grantees, and others to whom the privilege might be extended, but subject nevertheless to that necessary power of appropriate regulation, as to all those privileged, which inhered in the sovereignty of the State over the lands where the privilege was exercised."

these views have, however, been limited by implication in recent years by United States Supreme Court decisions. For example, in *Tulee* v. *Washington* (1942), 315 US 681 (62 S Ct 862, 86 L Ed 1115), the court held that the State could not require a fishing license fee without violating a treaty made in 1859 (12 Stat 951 [1859]). Likewise, in *Menominee Tribe* v. *United States, supra,* the court held that an act of Congress in 1954 did not terminate by implication the Wolf River Treaty of 1854 (10 Stat 1064 [1854]). The court held that valuable hunting and fishing rights given by a treaty were not easily extinguished without a specific statement on the subject. These cases, while not directly on point, do demonstrate a decisive trend in the decisions of the Federal courts toward granting Indians expanded rights under the various treaties. See, also, *Metlakatla Indian Community* v. *Egan* (1962), 369 US 45 (82 S Ct 552, 7 L Ed 2d 562); *Makah Indian Tribe* v. *Schoettler* (CA9, 1951), 192 F2d 224, and *Maison* v. *Confederated Tribes of Umatilla Indian Reservation* (CA9, 1963), 314 F2d 169.

Both parties have done an exceedingly fine job of analyzing in great detail the numerous cases dealing with Indian treaties. While these cases are instructive, they are not binding for two reasons:

First, these cases do not involve construction of the Chippewa Indian Treaty of 1854. Second, because of the change in judicial attitude over the past 30 years, we have two lines of conflicting precedent that are not conclusive to our determination of this case. We do, however, have one case directly on point.

*People* v. *Chosa* (1930), 252 Mich 154, involved an identical fact situation. Chosa and Attikons, members of the L'Anse band of Chippewa Indians, were convicted of violating fish and game laws. This Court affirmed. The Court stated (p 160):

"The treaties evidently established a servitude of the right to hunt and fish on the ceded land in favor of the Indians and against the exclusive dominion of private ownership, *but they provided no immunity from operation of game laws, as against the State.*" (Emphasis added.)

The people cite *Chosa* as determinative of the decision in this case. If *Chosa* is good law, then undoubtedly the people are correct. We believe that *Chosa* no longer states the applicable law. When *Chosa* was decided in 1930, our Court properly relied on the governing authorities as of that date. However, through the passage of time, the foundations upon which *Chosa* rested are no longer sustained as valid.

*Chosa* rested on two basic premises. Defendant Chosa had argued that the clause giving the President the power to abrogate the treaty was the only limit on the hunting and fishing rights. The Court answered, at p 160:

"As a restriction on operation of State game laws, it would be foreign to our system of government in providing control of sovereign powers of the State by an officer of another sovereignty."

This view, however, does not display a proper deference for the treaty power granted to the President by Article 2 of the United States Constitution, and under Article 6 of the United States Constitution, as stated *supra,* we, as State Court Judges must respect any treaty as superior to our state laws.

A somewhat similar conflict between state laws and the Federal treaty power arose in the case of *Missouri* v. *Holland* (1920), 252 US 416 (40 S Ct 382, 64 L Ed 641, 11 ALR 984). In 1916, the United States had made a treaty with Great Britian (39 Stat 1702 [1916]) for the protection, by closed hunting seasons and in other ways, of migratory birds in the United States and Canada. It bound each country to take the necessary measures for carrying out the treaty. Thereupon, Congress prohibited (Act of July 3, 1918, ch 128, 40 Stat 755 [1918]) killing, capturing, or selling any of the migratory birds designated by the terms of the treaty, except as permitted by regulations made by the Secretary of Agriculture. The State of Missouri filed a bill in equity to prevent Holland, a United States game warden, from attempting to enforce this act and the regulations made pursuant to it. The state claimed it was an unconstitutional interference with the rights reserved to the state by the Tenth Amendment and that the acts of the defendant invaded the sovereign powers of the state as owner of the wild birds. Mr. Justice Holmes, in upholding the treaty and the act passed pursuant thereto, stated (p 434):

"No doubt it is true that as between a State and its inhabitants the State may regulate the killing and sale of such birds, but it does not follow that its authority is exclusive of paramount powers. * * * Valid treaties of course 'are as binding within the territorial limits of the States as they

are elsewhere throughout the dominion of the United States.' *Baldwin* v. *Franks* [1887], 120 US 678, 683 [7 S Ct 656, 30 L Ed 766]. *No doubt the great body of private relations usually fall within the control of the State, but a treaty may override its power."* (Emphasis added.)

Thus, under the treaty power, the President may make determinations that affect the powers normally reserved to the state.

Second, our Court in *Chosa* relied on the fact that Indians were United States citizens and, thus, subject to all state laws. The Court stated (p 162):

"When one becomes a citizen of the United States, he casts off both the rights and obligations of his former nationality and takes on those which pertain to other citizens of the country. 11 C. J. p 786.

"Both because of the new citizenship and by the express terms of the statute under which the allotments were made, defendants became subject to the laws of the State, civil and criminal."

This contention was rejected by the United States Supreme Court in *Puyallup Tribe* v. *Department of Game of Washington* (1968), 391 US 392 (88 S Ct 1725, 20 L Ed 2d 689). Mr. Justice Douglas, speaking for the Court, stated (p 398):

"The right to fish 'at all usual and accustomed' places *may, of course, not be qualified by the State, even though all Indians born in the United States are now citizens of the United States."* (Emphasis added.)

Thus, the foundations upon which *Chosa* rested have not stood the test of time. We think the better view is expressed by the court in *State* v. *Arthur* (1953), 74 Idaho 251 (261 P2d 135), which involved the prosecution of members of the Nez Perce Tribe of Indians for having killed deer out of season on national forest lands. The deer were within the

exterior boundaries of land ceded to the Federal government under a treaty of 1855 (12 Stat 957 [1855]). The state contended that the game and fish regulations did apply to the ceded land. The district court sustained defendant's demurrer and entered an order dismissing the action. The state Supreme Court affirmed. The court pointed out that the holdings in such cases as *Ward* v. *Race Horse, supra,* and *Kennedy* v. *Becker, supra,* have been repudiated by later cases. The court stated (pp 261, 262):

"If the right exists in the State to regulate the killing of game upon open and unclaimed lands ceded by the Nez Perce Indians to the United States, it follows that such right is to be exercised under the police power of this state. Generally stated, the police power under the American constitutional system has been left to the states. * * * That the State has and may exercise such power generally is not the question * * * .

"[T]he statute of any state enacted pursuant to its police power which conflicts with any treaty of the United States constitutes an interference with matters that are within the exclusive scope of federal power and, hence, cannot be permitted to stand. 16 CJS, Constitutional Law, § 196, page 565; the treaty being superior to a particular state law and regulation, though the state law and regulation involved is otherwise within the legislative power of the state, the rights created under the treaty cannot thus be destroyed."

At pages 264, 265, the court further stated:

"One of the primary purposes of licensing in reference to fishing and hunting is to conserve wild life; the law is essentially a regulatory act rather than a revenue act. * * * While both fishing and hunting are primarily sport and recreation for most fishermen and hunters, this is not so with respect to the Indians; they have always fished and hunted to

obtain food and furs necessary for their existence
and have been controlled as to the time when and
the area where and the amount of catch or kill by
the exigencies of the occasion; while no doubt this
was more so in 1855 than it is now, the fact remains
that it is to a lesser extent also true today; be that
as it may, their rights reserved in this respect should
be determined in the light of conditions existing at
the time of the treaty and the manifest intent of all
contracting parties at that time.  *  *  *  If the posi-
tion of the State is sustained the assurance given by
Governor Stevens that they could kill game when
they pleased and the provision of the treaty reserv-
ing to them the right to hunt upon open and un-
claimed lands is no right at all.  Out of the solemn
obligations of the treaty, and the express reserved
property right which never passed from the Indians
to anyone and which the federal government has
never extinguished but has expressly recognized
before and after Idaho was admitted to the Union,
the Nez Perce would now have no right in any re-
spect different than that enjoyed by all others, ex-
cept perhaps the freedom from the burden of a
license fee.  This was never intended under the
broad, fair and liberal construction of the treaty.
The Supreme Court of the United States has recog-
nized and expressly held that the Indian treaty
fishing provisions accorded to them rights which do
not exist for other citizens.  *  *  *  What are such
rights under the State's theory?  Perhaps to hunt
without a license.  If such rights exist as to fishing
most assuredly they exist as to hunting.  If the
State can regulate the time of year in which they
may hunt then they are accorded no greater rights
in this respect than exist for other citizens.

"We are not here concerned with the wisdom of
the provisions of the treaty under present conditions
nor with the advisability of imposing upon the In-
dians certain regulatory obligations in the interest
of conserving wild life; that is for the Federal Gov-
ernment, the affected tribe, and perhaps the State

of Idaho to resolve under appropriate negotiations; our concern here is only with reference to protecting the rights of the Indians which they reserved under the Treaty of 1855 to hunt upon open and unclaimed land without limitation, restriction or burden."

While this case is not binding upon our Court, we believe that it expresses the proper balance between the rights of the Chippewa Indians and the police powers of the state under the treaty of 1854.

The people point out the fact that unlimited fishing rights could deplete our limited national resources. They rely on *Puyallup, supra,* where the court held that the state could provide regulations that were reasonably necessary for the conservation of fish. In an age of growing awareness of the need to preserve and protect our environment, this is an important consideration. However, unlike the treaty of 1855 considered in the *Arthur* case, the Chippewa Indian Treaty of 1854 does provide a safeguard. Under Article 11, the President may issue an order limiting or extinguishing the hunting and fishing rights of the Indians. The four fish involved in this case will not upset the ecological balance. However, if in the future the number of fish being taken does constitute such a threat, we are convinced that the President would take appropriate action.

We, therefore, overrule *People* v. *Chosa, supra,* and hold that the game regulations are invalid as applied to the defendant Jondreau and other Indians who are protected by the Chippewa Indian Treaty of 1854.

Judgment reversed.

T. M. KAVANAGH, C. J., and BLACK, ADAMS, T. E. BRENNAN, and WILLIAMS, JJ., concurred with SWAINSON, J.

*APPENDIX A*

BLACK, J. (*concurring*). I agree with and have endorsed the opinion Justice SWAINSON has prepared, yet would step a bit farther.

In the majestic phrasing of the Doxology, the supremacy clause* was from the beginning and is now really regnant. Its prospective force and effect upon the states, and "the Judges in every State," came to conception and birth when Michigan was both trackless and primeval. Binding us now, as in 1930 when *People* v. *Chosa,* 252 Mich 154 came to judicial attention, it says imperatively that "all Treates made"—along with the other components therein listed—"shall be the supreme Law of the Land." Now as in *Chosa* the same treaty of 1854 is before us, along with the same appeal to its overriding impact.

Today we find definitely that this same treaty of 1854 provided and now provides "a specific condition of enjoyment of the reservation" which to this day tolerates no challenge by Michigan and the courts of Michigan. No like finding, and no opposing finding, was made by the *Chosa* Court. Irrelevant reasons only were assigned for refusal to support the treaty-stipulated right of *Chosa* and *Attikons* to hunt and fish on the reservation. See pages 160 and 161 of *Chosa's* report.

In that setting *People* v. *Chosa* was released to our books a little over 40 years ago. This Court attempted then in contravention of the treaty and the supremacy clause to interpose subordinate interests of the state, and the never exercised revocatory power of the President, to block the enforcement of that treaty. This was something more than judicial error. It was pure nullity.

There is no occasion for overrulement or distinguishment of *Chosa.* It never became law in the first

---

* Article 6(2), Constitution of the United States.

place, both its judgment and the statute applied there having spent their whole force in the utterance of worthless words. *People* v. *Chosa* was, when handed down December 2, 1930, like the earth before it was made, "without form, and void." (Genesis ch. 1:2.)

T. G. KAVANAGH, J., did not sit in this case.