PEOPLE v LeBLANC

1. TREATIES—INDIANS—CONSTRUCTION.

The language used in treaties with the Indians should never be construed to their prejudice; how the words of a treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction.

2. TREATIES—INDIANS—CHIPPEWA INDIANS—FISHING RIGHTS.

The Treaty of 1836 gave the Chippewa Indians unlimited fishing rights in all the waters adjoining those lands which were ceded by the treaty, and such rights were not relinquished by the Treaty of 1855 (7 Stat 491 [1836], 11 Stat 621 [1856]).

3. TREATIES—FISHING RIGHTS—STATES—STATE LAW—CONSTITUTIONAL LAW—REGULATIONS.

State law cannot qualify or condition fishing rights under a Federal treaty; however, the state can, consistent with the mandates of the Constitution, regulate the time and manner in which such rights are exercised provided the regulations are nondiscriminatory and necessary for the conservation of fish.

4. CRIMINAL LAW—FISHING WITHOUT A LICENSE—TREATIES—FEDERAL TREATY RIGHT—STATUTES.

A defendant Chippewa Indian's conviction of fishing without a commercial license is reversed because the application of the state statute to such a defendant conflicts with the exercise of a federal treaty right (7 Stat 491 [1836]; MCLA 308.22).

5. CRIMINAL LAW—USE OF GILL NETS—TREATIES—FISHING RIGHTS—STATUTES.

A statute which outlaws the use of gill nets may properly be applied to a defendant Chippewa Indian, who was given fishing rights pursuant to a Federal treaty, if the state can show that the statute is necessary to prevent a substantial depletion of the fish supply (MCLA 302.1).

REFERENCES FOR POINTS IN HEADNOTES

[1] 41 Am Jur 2d, Indians § 12.

[2–5] 41 Am Jur 2d, Indians § 19.

Appeal from Chippewa, William F. Hood, J. Submitted Division 3 February 11, 1974, at Detroit. (Docket No. 16394.) Decided October 7, 1974. Leave to appeal applied for.

Albert B. LeBlanc was convicted in district court of fishing without a commercial license and fishing with a gill net. Defendant appealed to circuit court. Affirmed. Defendant appeals. Conviction of fishing without a commercial license reversed; conviction of fishing with a gill net remanded for further proceedings.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Farrell E. Elliott,* Prosecuting Attorney, for the people.

Upper Peninsula Legal Services, Inc., by *William J. James,* Director (Michigan Legal Services Assistance Program, *Alan W. Houseman,* Director, and *Jeanne F. Franklin,* Staff Attorney, of counsel), for defendant.

Before: V. J. Brennan, P. J., and McGregor and T. M. Burns, JJ.

V. J. Brennan, P. J. On September 28, 1971, Albert B. LeBlanc, the defendant herein and a full-blooded Chippewa Indian, was arrested by an officer of the Michigan Department of Natural Resources and charged with fishing without a commercial license in violation of MCLA 308.22; MSA 13.1513 and with fishing with a gill net contrary to the provisions of MCLA 302.1; MSA 13.1602. He was tried before District Court Judge Nicholas J. Lambros on October 5, 1971, and found guilty on both counts. His conviction was affirmed by the Chippewa County Circuit Court and he now appeals to this Court upon leave granted.

At trial defendant admitted the acts complained

of but asserted that he could not be convicted of the crimes charged because to do so would conflict with a Federal treaty guaranteeing to all Chippewa Indians living on the Bay Mills Indian Reservation the right to fish in the Whitefish Bay area of Lake Superior, including Pendill's Bay—the area in which defendant was fishing at the time of his arrest.

The treaty relied on by defendant is the Treaty of 1836[1], Article XIII of which provides:

"The Indians stipulate for the right of hunting on the lands ceded, with the other usual privileges of occupancy, until the land is required for settlement."

Judge Lambros found that the clause "other usual privileges of occupancy" embraced the right of unlimited fishing in "all the waters adjoining those lands ceded by the treaty until required for settlement". This finding is entirely consistent with the rules governing interpretation of Indian treaties and is not challenged by the prosecution on this appeal. Judge Lambros also found, however, that by the Treaty of 1855[2] the Chippewa Indians gave up these fishing rights. This treaty provides, in relevant part:

"ARTICLE 3. The Ottawa and Chippewa Indians hereby release and discharge the United States from all liability of account of former treaty stipulations, it being distinctly understood and agreed that the grants and payments hereinbefore provided for are in lieu and satisfaction of all claims; legal and equitable on the part of said Indians jointly and severally against the United States, for land, money or other thing guaranteed to said tribes or either of them by the stipulations of any former treaty or treaties; excepting, however, the

---

[1] 7 Stat 491 (1836).

[2] 11 Stat 621 (1856).

right of fishing and encampment secured to the Chippe-
was of Sault Ste. Marie by the treaty of June 16, 1820."

Judge Lambros held that by this language "the
Chippewa Indians released and relinquished for-
ever all right to unlimited fishing in the off-shore
waters of Bay Mills no matter how such rights
were secured to them". Judge Hood of the Chip-
pewa County Circuit Court upheld this determina-
tion also concluding that the Treaty of 1855 served
to eliminate the Chippewas' fishing rights under
the Treaty of 1836. It is from this decision that
defendant now appeals.

In *People v Jondreau,* 384 Mich 539, 544; 185
NW2d 375, 377–378 (1971), our Supreme Court laid
down certain rules which were to be followed in
the interpretation of Indian treaties. Our Supreme
Court there said:

"Although there is no legislative history available on
the making of this treaty, we are aided by the fact that
the United States Supreme Court has laid down general
rules of construction in cases involving Indian treaties.
In *Worcester v Georgia,* 31 US (6 Peters) 515 (8 L Ed
483) (1832), Justice McLean stated (p 582):
" 'The language used in treaties with the Indians
should never be construed to their prejudice. * * * How
the words of the treaty were understood by this unlet-
tered people, rather than their critical meaning, should
form the rule of construction.'
"In *Choctaw Nation v United States,* 119 US 1 (7 S Ct
75, 30 L Ed 306) (1886), after quoting the above state-
ment, the court said (p 28):
" 'The parties are not on an equal footing, and that
inequality is to be made good by the superior justice
which looks only to the *substance of the right,* without
regard to technical rules framed under a system of
municipal jurisprudence, formulating the rights and
obligations of private persons, equally subject to the
same laws. (Emphasis added.)' "

It appears to us that the construction given the Treaty of 1855 by the lower courts is inconsistent with the rules governing the interpretation of Indian treaties stated above and ignores the central role fishing has historically played in the lives of the Chippewa Indians.

The provision of the 1855 treaty relied upon to show that the fishing rights secured by the 1836 treaty were subsequently relinquished is Article 3. A close reading of that section shows, however, that in order for us to uphold the lower courts' determinations we would be required to say that the Chippewas' fishing rights constituted a "liability" or a claim, legal or equitable, for "land, money or other thing" guaranteed to the Chippewas by former treaty stipulations and that this reading of the treaty comports with how it was understood by the Chippewa Indians. *Worcester v Georgia,* 31 US (6 Pet) 515; 8 L Ed 483 (1832); *People v Jondreau, supra.* This we are unable to do. The fishing rights reserved to the Chippewa Indians by the Treaty of 1836 are precisely that—rights. They do not constitute a claim against the United States, as that term is generally understood, nor do they constitute a liability. To hold that they do is to give such words a meaning wholly at odds with what appears to have been intended by the parties to be encompassed within the terms of this provision.

By the Treaty of 1836 the Chippewas ceded certain lands to the United States, reserved parts thereof for their own use and retained to themselves the right to hunt and fish on the ceded lands. In return for this cession of land the United States agreed to pay the Chippewas certain amounts of money for various purposes, to provide

them with various goods and services, and to furnish them a new home in an area southwest of the Missouri River. Furthermore, the Ottawa Indians, also parties to the Treaty of 1836, and the Treaty of 1855, were entitled to receive an annual payment from the Federal government as their share of permanent annuities guaranteed them by earlier treaties.[3] Article 3 of the 1855 treaty was intended to eliminate these types of claims— claims arising from earlier treaty provisions securing land, money, goods and services to the Indians. The Treaty of 1855 was designed to consolidate the Federal government's obligations to the Indians and provide mutually agreeable substituted forms of performance. Nothing on the record indicates that the parties ever intended to eliminate the Chippewas' fishing rights by this clause. In reaching the conclusion that the issue of fishing rights was considered by the parties to this treaty, the district court placed much reliance on the fact that Article 3 specifically excepted from its application the fishing rights at Sault Ste. Marie, secured to the Chippewas by the Treaty of 1820.[4] Such a conclusion, however, ignores the special circumstances surrounding that particular grant of fishing rights.

A perpetual right of fishing and encampment at Sault Ste. Marie was secured by the Treaty of 1820 to the Chippewas who, by this same treaty, ceded certain lands at Sault Ste. Marie to the United States. Although the right to fish at this particular

---

[3] The treaties guaranteeing such annuities were the treaties of August 3, 1795, November 17, 1807, September 17, 1818, and August 29, 1829. See Letter from George H. Manypenny and Henry C. Gilbert, Commissioners, to the Department of the Interior, Office of Indian Affairs, dated August 7, 1855.

[4] 7 Stat 206 (1821).

site was highly prized by the Chippewas,[5] the construction of a canal on the ceded lands virtually destroyed the grounds for encampment and severely injured the fishing. The Chippewas were, at the time the 1855 treaty was signed, demanding large sums of money from the Federal government as compensation for the destruction of their rights under the 1820 treaty. It was to preserve this claim against the United States that Article 3 contained the exception referred to above. To read any more into this "exception" clause is to give effect to a technical interpretation of the treaty rather than to interpret it as it would have been understood by the Chippewas—the method of interpretation we are bound to follow. *Worcester v Georgia, supra; People v Jondreau, supra.*

The controversy surrounding the destruction of the Chippewas' fishing rights at Sault Ste. Marie is instructive from another point of view also, for it illustrates how highly such rights were valued by the Chippewas. The destruction of their fishing grounds at Sault Ste. Marie led the Chippewas to demand compensation far above that which such rights could be supposed to have been worth by Commissioners of the Office of Indian Affairs.[6] Indeed a separate treaty[7] was entered into between the United States and the Chippewa Indians to settle the dispute surrounding the destruction of these rights. It would be anomalous for this Court now to say that the Chippewas relinquished their fishing rights under the 1836 treaty by the broadly phrased Article 3 of the 1855 treaty without making similar demands.

---

[5] See Letter from George H. Manypenny and Henry C. Gilbert, Commissioners, to the Department of the Interior, Office of Indian Affairs, dated August 7, 1855.

[6] *Id.*

[7] Treaty of August 2, 1855 (11 Stat 631 [1856]).

For all the foregoing reasons we hold that the Chippewa Indians did not, by the 1855 treaty, relinquish the fishing rights they retained on the ceded lands under the 1836 treaty. This being the case, then it is clear that defendant is exempt from the provisions of the statutes under which he was charged to the extent that they conflict with the Federal treaty rights. *People v Jondreau, supra;* US Const, art VI; MCLA 305.1a; MSA 13.1623(1).

In determining whether the statutes here involved conflict with the Chippewas' fishing rights under the treaty much guidance is provided by the recent decision of the United States Supreme Court in *Puyallup Tribe v Department of Game,* 391 US 392; 88 S Ct 1725; 20 L Ed 2d 689 (1968). The Supreme Court there held that, although such rights cannot be qualified or conditioned by state law, the state can, consistent with the mandates of the Constitution, regulate the time and manner in which such rights are exercised provided the regulations are nondiscriminatory and necessary for the conservation of fish. See also *Tulee v State of Washington,* 315 US 681; 62 S Ct 862; 86 L Ed 1115 (1942).

In *Tulee v State of Washington, supra,* the United States Supreme Court reversed the conviction of a member of the Yakima tribe of Indians for fishing with a net without first having obtained a license so to do. The Supreme Court there held that, although the State could regulate the time and manner of fishing outside a reservation as would be necessary for the conservation of fish, the State could not require the Indians to purchase a license before allowing them to exercise their fishing rights under a Federal treaty. Although we are here concerned with a different treaty, we can see

no other difference between *Tulee* and the case presently before us which would require a different result. We, therefore, reverse defendant's conviction for fishing without a commercial license on the basis of the decision in *Tulee,* since such a law conditions the exercise of a Federal treaty right.

The statute under which defendant was convicted for fishing with a gill net, however, does not qualify or condition the exercise of a Federal treaty right but, rather, regulates the manner in which such right can be exercised. We are unable to determine from the present record, though, whether the statute which is sought to be enforced against this defendant, MCLA 302.1; MSA 13.1602, insofar as it outlaws the use of gill nets, is necessary for the conservation of fish. We, therefore, remand this part of the case to the district court for such a determination. At this hearing the state shall be required to "show that the [statutes] which it seeks to enforce against the Chippewa are reasonable and necessary to prevent a substantial depletion of the fish supply". *State v Gurnoe,* 53 Wis 2d 390, 410; 192 NW2d 892 (1972). If a showing is made that MCLA 302.1; MSA 13.1602, insofar as it outlaws the use of gill nets, is necessary to prevent a substantial depletion of the fish supply then defendant's conviction for fishing with a gill net should be affirmed; if not, then his conviction for fishing with a gill net should be reversed.

In summary, then, we hold that by the Treaty of 1836 the Chippewa Indians were given fishing rights in all the waters adjoining those lands ceded by the treaty and that such rights were not relinquished by any provision of the Treaty of 1855. We further hold that defendant's conviction for fishing without a commercial license in violation of MCLA 308.22; MSA 13.1513 is hereby reversed since its

application to this defendant conflicts with a Federal treaty right. Finally, with respect to defendant's conviction for fishing with a gill net in violation of MCLA 302.1; MSA 13.1602, the case is remanded to the district court for a determination as to whether MCLA 302.1; MSA 13.1602, insofar as it outlaws the use of gill nets, is necessary to prevent a substantial depletion of the fish supply. If such a showing is made by the state then defendant's conviction for violation of MCLA 302.1; MSA 13.1602 should be affirmed; if not, then his conviction should be reversed.

Conviction for violation of MCLA 308.22; MSA 13.1513 reversed; case remanded to the district court for further proceedings not inconsistent with this opinion.

All concurred.