PEOPLE v LeBLANC

Docket Nos. 56547, 56567. Argued March 4, 1976 (Calendar Nos. 6, 7).
   —Decided December 27, 1976.

   Albert B. LeBlanc, a Chippewa Indian, was convicted in the 91st
   District Court, Nicholas J. Lambros, J., of fishing without a
   commercial license and fishing with a gill net, and the Chip-
   pewa Circuit Court, William F. Hood, J., affirmed. The defend-
   ant admitted the acts as charged but asserted that to convict
   him would conflict with a Federal treaty guaranteeing to all
   Chippewa Indians living on the Bay Mills Indian Reservation
   the right to fish in the Whitefish Bay area of Lake Superior
   including Pendills Bay, where he was fishing when he was
   arrested. The Court of Appeals, V. J. Brennan, P. J., and Mc-
   Gregor and T. M. Burns, JJ., reversed the conviction of fishing
   without a license, and remanded the cause to the district court
   for a determination whether the statutory ban on gill nets is
   necessary to prevent a substantial depletion of the fish supply,
   in which case the second conviction would be affirmed (Docket
   No. 16394). Both parties appeal. *Held:*

   1. The Chippewa Indians in the Treaty of 1836 reserved
   fishing rights in the waters of Pendills Bay, where the defend-
   ant was arrested. These fishing rights were not relinquished by
   the Treaty of 1855. Pendills Bay is not part of the present-day
   Bay Mills Reservation, and the defendant was not exercising an
   on-reservation fishing right when arrested there, but he had off-
   reservation fishing rights pursuant to the treaty, and his con-
   viction of fishing without a commercial license cannot stand.

   2. Indian treaties, so far as possible, must be interpreted as
   the Indians would have understood them. Ambiguities found in
   Indian treaties are to be resolved in favor of the Indians.

   3. The record below clearly indicates that fishing was central
   to the Chippewa way of life at the time the Treaty of 1836 was

---

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 7–10] 41 Am Jur 2d, Indians § 19.
   Right of public to fish in stream notwithstanding objection by
   riparian owner, 47 ALR2d 381.
[3, 4, 6] 41 Am Jur 2d, Indians § 54.
[5] 43 Am Jur 2d, Indians § 23 *et seq.*

negotiated, and that the fishing was commercial as well as subsistence fishing. The "rights of hunting on the lands ceded, with the other usual privileges of occupancy" was understood by the Chippewas to include the right to fish.

4. The Chippewas held aboriginal title, or "Indian title" at least to the area of the Great Lakes, Pendills Bay, in which the defendant was arrested, which gave the Chippewa the non-treaty possessory rights of American natives to territory which they had continually occupied before the advent of white civilization. That right is good against all but the sovereign; and once the United States was organized and the Constitution was adopted, the tribal rights to occupy Indian lands became the exclusive province of the Federal law. The Indians would not have understood the Treaty of 1855 to terminate hunting and fishing rights reserved in the Treaty of 1836 given the absence of any mention of such prospect; therefore, the fishing rights reserved by the Chippewas have not been terminated under the terms of the Treaty of 1855.

5. The State of Michigan has limited authority to regulate off-reservation fishing rights of the Chippewa Indians. The regulation by the state is valid only if: (1) it is necessary for the preservation of the fish protected by the regulation, (2) the application of the regulation to the Indians holding off-reservation fishing rights is necessary for the preservation of the fish protected, and (3) the regulation does not discriminate against the treaty Indians. On remand the district court should uphold defendant's conviction of fishing with an illegal device only if the prohibition of the gill net is valid under those standards.

Affirmed and remanded to the district court for a determination of the validity of the regulation prohibiting gill nets.

Justice Lindemer, who was joined by Justice Coleman, agreed that the Treaty of 1836 granted the Chippewa Indians the right to fish in Pendills Bay, but concluded that those rights were limited "until the land is required for settlement", and that the Treaty of 1855 extinguished any fishing rights that existed pursuant to Article Thirteenth of the Treaty of 1836. Fishing was a usual privilege of occupancy of land, and the privilege of fishing in a body of water could not be separated from the privilege of using the land surrounding or abutting it. The treaty negotiations are bereft of any mention of fishing rights, immemorial or otherwise. Rather both parties anticipated that the Chippewa would not continue their traditional life style, but would be assimilated into the white society. The convictions should be affirmed.

Justice Ryan voted to affirm the convictions because he

agreed with Justice Lindemer that Article Thirteenth of the Treaty of 1836 must be interpreted to mean that settlement of the land of the Upper Peninsula terminates all usual privileges of occupancy associated with the land. He agreed, however, with Justice Williams that the decisions of the United States Supreme Court regarding the construction of Indian treaties required the conclusion on this record that the Treaty of 1855 did not extinguish any of the fishing rights granted the Chippewas in the Treaty of 1836.

55 Mich App 684; 223 NW2d 305 (1974) affirmed.

OPINION OF THE COURT

1. INDIANS—TREATIES—CHIPPEWA INDIANS—FISHING RIGHTS.

The Chippewa Indians in the Treaty of 1836 reserved unlimited fishing rights in all the waters adjoining the lands which were ceded by the treaty, and those rights were not relinquished by the Treaty of 1855 (7 Stat 491 [1836], 11 Stat 621 [1856]).

2. INDIANS—TREATIES—FISHING RIGHTS—STATES—REGULATIONS.

The state has limited authority to regulate Indian fishing rights under a Federal treaty; but the regulation is valid only if (1) it is necessary for the preservation of the fish protected by the regulation; (2) the application of the regulation to the Indians holding off-reservation fishing rights is necessary for the preservation of the fish protected; and (3) the regulation does not discriminate against the treaty Indians.

3. INDIANS—TREATIES—CONSTRUCTION.

Indian treaties, so far as possible, must be interpreted as the Indians would have understood them.

4. INDIANS—TREATIES—CONSTRUCTION.

Ambiguities found in Indian treaties are to be resolved in favor of the Indians in construing the language of the treaties.

5. INDIANS—FEDERAL LAW—OCCUPANCY OF LANDS—ABORIGINAL TITLE.

An aboriginal right of occupancy of lands by the Indian tribes is good against all but the sovereign and could be terminated only by sovereign act; once the United States was organized and the Constitution adopted, these tribal rights to occupy Indian lands became the exclusive province of the Federal law.

6. INDIANS—TREATIES—CONSTRUCTION.

The language used in treaties with the Indians should never be construed to their prejudice; how the words of a treaty were

understood by this unlettered people, rather than their critical meaning, should form the rule of construction.

7. CRIMINAL LAW—FISHING WITHOUT A LICENSE—INDIANS—TREATIES.

A defendant Chippewa Indian's conviction of fishing without a commercial license is reversed because the application of the state statute to the defendant conflicts with the exercise of a Federal treaty right (7 Stat 491 [1836]; MCL 308.22; MSA 13.1513).

DISSENTING OPINION

COLEMAN and LINDEMER, JJ.

8. INDIANS—TREATIES—CHIPPEWA INDIANS—FISHING RIGHTS.

*The Chippewa Indians, in the Treaty of 1836, reserved fishing rights in all the waters adjoining the lands which were ceded by the treaty, but those rights were relinquished by the Treaty of 1855; the rights reserved by the Treaty of 1836 were intended to be temporary, as a privilege of occupancy associated with the land, the Treaty of 1855 provided for payments of money in lieu of claims for land, and the intention of the parties in the later treaty was that the Chippewas would not continue their traditional life style, but would be assimilated into the white society (7 Stat 491 [1836], 11 Stat 621 [1856]).*

DISSENTING OPINION

RYAN, J.

9. INDIANS—TREATIES—CHIPPEWA INDIANS—FISHING RIGHTS.

*The Chippewa Indians in the Treaty of 1836 reserved fishing rights in all the waters adjoining the lands which were ceded by the treaty, but the language of the treaty must be interpreted to mean that settlement of the land terminates all usual privileges of occupancy associated with the land; it being manifest that the land in Michigan's Upper Peninsula is required for settlement, the fishing rights acquired under the treaty are extinguished (7 Stat 491 [1836]).*

10. INDIANS—TREATIES—CHIPPEWA INDIANS—FISHING RIGHTS.

*The fishing rights granted to the Chippewa Indians in the Treaty of 1836 were not extinguished by the Treaty of 1855 (7 Stat 491 [1836], 11 Stat 621 [1856]).*

*Frank J. Kelley,* Attorney General, *Robert A.*

*Derengoski,* Solicitor General, and *Jerome Maslow-ski* and *Stewart H. Freeman,* Assistants Attorney General, for the people.

*Kathryn Tierney, William J. James,* and *Bruce R. Greene* for the defendant.

Amici Curiae:

*Friehofer, Hecht, Oosterhouse & DeBoer, P. C.* (by *Peter W. Steketee)* for Michigan United Conservation Clubs and Trout, Unlimited.

WILLIAMS, J. Defendant A. B. LeBlanc, a Chippewa Indian and an enrolled member of the Bay Mills Indian Community, was arrested on September 28, 1971 in Pendills Bay of Lake Superior about 20 miles west of Sault Ste. Marie by a conservation officer for the Michigan Department of Natural Resources and charged with fishing commercially without a license and with fishing with an illegal device, a gill net. He was convicted of both charges in district court.

Defendant's appeal of these convictions presents complex issues involving, on the one hand, the existence and continued vitality of fishing rights for Chippewa Indians under the Treaty of 1836 and the Treaty of 1855,* and, on the other hand, the authority of the State of Michigan in the conservation of natural resources to regulate the exercise of whatever fishing rights remain reserved by the Chippewas under those treaties.

---

* 7 Stat 491 (1836), 11 Stat 621 (1856). The Indian treaties are compiled in *Indian Treaties: 1778–1883* (Kappler, 2d ed, Interland Publishing, Inc, 1972), which was originally published as 2 *Indian Affairs: Laws and Treaties* (Kappler, Washington, DC, United States Government Printing Office, 1904), herein cited as "2 Kapp".—RE-PORTER.

Specifically, three central issues require resolution:

(1) Did the Chippewa Indians, pursuant to the Treaty of 1836, in ceding their title to the territory involved, reserve the right to fish in the waters where defendant was arrested?

(2) If such fishing rights were reserved by the Chippewas in the Treaty of 1836, were these rights relinquished by the Treaty of 1855?

(3) If the Chippewas continue to possess reserved fishing rights, may the State of Michigan regulate the exercise of those rights, and if so, to what extent?

We hold that the Chippewa Indians did reserve fishing rights in the waters where defendant was arrested pursuant to the Treaty of 1836, that these fishing rights were not relinquished by the Treaty of 1855, and that the State of Michigan has limited authority to regulate those rights, as described below.

Specifically, with regard to the state's authority to regulate off-reservation fishing rights, the state regulation is valid only if:

1) it is necessary for the preservation of the fish protected by the regulation;

2) the application of the regulation to the Indians holding the off-reservation fishing right is necessary for the preservation of the fish protected;

3) and the regulation does not discriminate against the treaty Indians.

Pursuant to these holdings, we affirm the Court of Appeals reversal of defendant LeBlanc's conviction for fishing without a commercial license, and affirm the Court of Appeals remand to the district court on the charge of fishing with an illegal

device for a determination of whether the state prohibition of gill nets meets the standards for state regulation of off-reservation fishing rights and whether defendant LeBlanc's second conviction must stand or fall. The standards for these determinations are outlined in this opinion.

## I—Facts

Defendant LeBlanc has not disputed that he was fishing commercially without a license and with a gill net at the time of his arrest.

That arrest took place on September 28, 1971 in Pendills Bay of Lake Superior, a part of Whitefish Bay. (See Appendix—Map I.)

At trial before District Court Judge Lambros, defendant's sole defense was that he had a right to fish free from state regulations and control pursuant to the Treaty of 1836.

He was found guilty of engaging in commercial fishing without a license under MCLA 308.22; MSA 13.1513 and of fishing with an illegal device under MCLA 302.1; MSA 13.1602.

These convictions were affirmed by the Circuit Court of Chippewa County on December 27, 1972.

The Court of Appeals, however, granted leave, and in October of 1974 reversed defendant's conviction for fishing commercially without a license, holding that the application of the license requirement conflicted with defendant's treaty rights, and remanded the case to district court for a determination of whether the prohibition of gill nets is necessary to prevent a substantial depletion of the fish supply. Under the Court of Appeals decision, if the state does not meet the burden of proving that the prohibition against gill nets is necessary to prevent a substantial depletion of the fish supply

on remand, then the defendant's conviction under MCLA 302.1; MSA 13.1602 must also be reversed.

Both the people and defendant LeBlanc applied for leave to appeal to the Supreme Court, leave being granted on February 26, 1975.

The people appeal the Court of Appeals holding that the Chippewas reserved "fishing rights in all the waters adjoining those lands ceded by the treaty [of 1836] and that such rights were not relinquished by any provision of the Treaty of 1855".

Defendant LeBlanc challenges the Court of Appeals holding that the state may regulate the manner of taking fish if the regulation is "necessary to prevent a substantial depletion of the fish supply".

## II—RESERVED FISHING RIGHTS UNDER THE TREATY OF 1836

The Treaty of 1836 was negotiated by the United States with the Chippewa and Ottawa Indians in Michigan as part of an official policy of removing Indians from their traditional homelands and resettling them west of the Mississippi, beyond the borders of the rapidly expanding civilization of non-Indian Americans.[1]

In Article First of this particular treaty, the Chippewas and the Ottawas ceded to the United States territory now constituting roughly the northern third of Michigan's Lower Peninsula and the eastern half of its Upper Peninsula.[2] (See Appendix—Map II.)

---

[1] By the act of May 28, 1830, 4 Stat 411, Congress officially established the policy of exchanging Federal lands west of the Mississippi for other lands then held by Indian tribes.

[2] Article First of the Treaty of 1836 is quoted in its entirety in footnote 7, *infra.*

In exchange, the Chippewas and Ottawas were to receive certain monetary payment for a period of years, and certain land to the southwest of the Missouri River where they were to find their "final settlement".

Under the treaty, the Chippewas reserved certain rights. Defendant LeBlanc based his claim of treaty fishing rights on two alternative grounds arising out of two separate treaty provisions, Article Thirteenth and Article Third.

In Article Thirteenth, the Chippewas retained certain rights in the area ceded pursuant to Article First:

"ARTICLE THIRTEENTH. The Indians stipulate for the right of hunting on the lands ceded, with the other usual privileges of occupancy, until the land is required for settlement."

Defendant LeBlanc argues first that rights reserved in Article Thirteenth include the right to fish.

In Article Third, the Chippewas reserved certain areas along the coast of the Great Lakes, including a large area in the Upper Peninsula which encompassed the present-day site of the Bay Mills Reservation, home of defendant LeBlanc. It is argued second that Pendills Bay, where defendant was arrested, was included in the area reserved by the Chippewas in Article Third and is part of the present day Bay Mills Reservation.[3]

The District Court and the Court of Appeals concluded that defendant LeBlanc did hold off-reservation fishing rights pursuant to Article Thir-

---

[3] Defendant first raised the argument that he was within the confines of the Bay Mills Reservation when arrested on application to the Court of Appeals for rehearing. This application was denied.

teenth.[4] We agree with this conclusion and reject defendant's argument that Pendills Bay is part of the present-day Bay Mills Reservation.

## A. *Article Thirteenth of the Treaty of 1836.*

In construing Article Thirteenth of the Treaty of 1836, we are constrained to follow certain well-settled rules of construction for interpretation of Indian treaties established by the United States Supreme Court.

First, the Supreme Court has held that, so far as is possible, Indian treaties must be interpreted as the Indians would have understood them. The foundation of this rule of construction was explained in *Jones v Meehan,* 175 US 1, 10–11; 20 S Ct 1; 44 L Ed 49 (1899), as follows:

"In construing any treaty between the United States and an Indian tribe, it must always * * * be borne in mind that the negotiations for the treaty are conducted, on the part of the United States, an enlightened and powerful nation, by representatives skilled in diplomacy, masters of a written language, understanding the modes and forms of creating the various technical estates known to their law, and assisted by an interpreter employed by themselves; that the treaty is drawn up by them and in their own language; that the Indians, on the other hand, are a weak and dependent people, who have no written language and are wholly unfamiliar with all forms of legal expression, and whose only knowledge of the terms in which the treaty is framed is that imparted to them by the interpreter employed by the United States; and that *the treaty must therefore be construed,* not according to the technical meaning of its words to learned lawyers, but *in the sense in which they would naturally be understood by the Indians."* (Emphasis added.)

---

[4] The lower courts reached no conclusion as to the effect of Article Third because defendant did not raise this issue before them.

The United States Supreme Court has recently reaffirmed this rule of construction in *Choctaw Nation v Oklahoma,* 397 US 620, 631; 90 S Ct 1328; 25 L Ed 2d 615, *reh den* 398 US 945; 90 S Ct 1834; 26 L Ed 2d 285 (1970).

Second, the United States Supreme Court has directed that ambiguities found in Indian treaties are to be resolved in favor of the Indians. See *McClanahan v Arizona State Tax Commission,* 411 US 164, 174; 93 S Ct 1257; 36 L Ed 2d 129 (1973); *Carpenter v Shaw,* 280 US 363, 367; 50 S Ct 121; 74 L Ed 478 (1930); *Winters v United States,* 207 US 564, 576–577; 28 S Ct 207; 52 L Ed 340 (1908); *People v Jondreau,* 384 Mich 539, 544; 185 NW2d 375 (1971). As explained in these cases, the Indians were an unlettered people who were not on equal footing with the United States government in their treaty negotiations. It should therefore not be expected that they would have protected themselves against ambiguities in the treaty language. Given this inequitable bargaining situation, fairness demands that any ambiguity be resolved in favor of the Indians.

Applying these rules of construction to the language of Article Thirteenth of the Treaty of 1836, we can only come to the conclusion that the Chippewas reserved their fishing rights in the territory ceded to the United States.

The record below clearly indicates that fishing was central to the Chippewa way of life at the time the Treaty of 1836 was negotiated. Part of the extensive and uncontroverted evidence of this fact included an 1836 report by the Acting Superintendent of Michigan for Indian Affairs to the Commissioner of Indian Affairs stating in part as follows:

"The Chippewas cultivate corn and potatoes to a

limited extent, but devote most of their time in quest of food in the chase or in fishing."

Clearly too, Chippewa fishing had a commercial dimension. In fact, Article Fourth of the Treaty of 1836 provided for the delivery of 10,000 fish barrels and 2,000 barrels of salt to the Indians over a 20-year period to be used in the fishing business.[5]

Given the central position of fishing, both subsistence and commercial, in the Chippewa culture during the time period of the Treaty of 1836, there can be little doubt that the Indian stipulation in Article Thirteenth "for the right of hunting on the lands ceded, with the other usual privileges of occupancy" was understood by the Chippewas to include the right to fish.

This conclusion is buttressed by the recognition that provisions allowing the Indians to fish on ceded lands were included in treaties with Michigan Indian tribes as a matter of course.[6]

---

[5] The pertinent portion of Article Fourth reads as follows:

"In consideration of the foregoing cessions, the United States engage to pay to the Ottawa and Chippewa nations, the following sums, namely. * * * 6th. * * * one hundred barrels of salt, and five hundred fish barrels, annually, for twenty years."

The importance of commercial fishing in this area at the time of the Treaty of 1836 is well-described in a letter from Henry Schoolcraft, author of *Personal Memoirs of a Residence of Thirty Years with the Indian Tribes * * * A.D. 1812 to A.D. 1842:*

"The number of fishing stations about the coast is numerous, and the points where fish are taken are annually increasing, under the incipient enterprise of the inhabitants. It would be difficult to estimate the present value of this trade to commerce. Several thousands of barrels of fish are put up annually. One thousand barrels were brought from Lake Superior to the present season. The waters of this lake are probably destined to yield an exhaustless supply of this article. Twenty thousand dollars worth of fish may be expected to be barreled in the upper lakes the present year."

[6] For example, in the Treaty of Detroit, November 17, 1807 (7 Stat 105, 2 Kapp 92), Article V provided: "Indian nations shall enjoy the privilege of hunting and fishing on the lands ceded as aforesaid, as long as they remain the property of the United States".

For similar provisions *see:* Treaty of Greenville, August 3, 1795 (7

Moreover, our interpretation of Article Thirteenth is consistent with the United States Supreme Court's holding in *Menominee Tribe of Indians v United States,* 391 US 404, 405–406; 88 S Ct 1705; 20 L Ed 2d 697 (1968), that the phrase "to be held as Indian lands are held" in the Treaty of Wolf River included the right to hunt and fish.

The people argue that even if this interpretation of Article Thirteenth is correct, defendant LeBlanc does not possess reserved fishing rights pursuant to the Treaty of 1836 for two reasons:

(1) The Chippewas and the Ottawas did not hold aboriginal title to the waters of the Great Lakes within the boundaries outlined in Article First of the Treaty of 1836, and therefore did not cede the waters of the Great Lakes to the United States in the Treaty of 1836. Since defendant LeBlanc was arrested in a bay in Lake Superior, it is argued that he cannot claim to be protected from state regulation by fishing rights reserved in the lands ceded in the Treaty of 1836.

(2) Any fishing rights reserved in territory ceded in the Treaty of 1836 have been terminated pursuant to the phrase "until the land is required by settlement" in Article Thirteenth.

With regard to the people's first claim, we conclude that the Chippewas did in fact hold aboriginal title at least to the area in which defendant LeBlanc was arrested.

The concept of aboriginal title, sometimes called Indian title, describes the non-treaty possessory rights of American natives to territory which they

Stat 49, 2 Kapp 39), Article VII; Treaty of Fort Industry, July 4, 1805 (7 Stat 87, 2 Kapp 77), Article VI; Treaty of Brownstown, November 25, 1808 (7 Stat 112, 2 Kapp 99), Article IV; Treaty of Miami Rapids, September 29, 1817 (7 Stat 160, 2 Kapp 145), Article 11; Treaty of Saginaw, September 24, 1819 (7 Stat 203, 2 Kapp 185), Article 5; Treaty of Chicago, August 29, 1821 (7 Stat 218, 2 Kapp 198), Article 5.

had continually occupied before the advent of white civilization.

The principles of aboriginal title were first put forth by Chief Justice Marshall in *Johnson v McIntosh,* 21 US (8 Wheat) 543; 5 L Ed 681 (1823), in terms that were recently reaffirmed by the United States Supreme Court in *Oneida Indian Nation v Oneida County,* 414 US 661, 667; 94 S Ct 772; 39 L Ed 2d 73 (1974), as follows:

"It very early became accepted doctrine in this Court that although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign—first the discovering European nation and later the original States and the United States—a right of occupancy in the Indian tribes was nevertheless recognized. That right, sometimes callèd Indian title and good against all but the sovereign, could be terminated only by sovereign act. Once the United States was organized and the Constitution adopted, these tribal rights to Indian lands became the exclusive province of the federal law. Indian title, recognized to be only a right of occupancy, was extinguishable only by the United States."

The corollary of the power of the United States to extinguish the Indian's aboriginal title is the power of the United States to *determine* which Indian tribes rightfully held aboriginal title. *Cramer v United States,* 261 US 219, 227; 43 S Ct 342; 67 L Ed 622 (1923), quoted with approval in *United States v Santa Fe P R Co,* 314 US 339, 345; 62 S Ct 248; 86 L Ed 260 (1941), and *Oneida Indian Nation v Oneida County, supra.* This determination was often made in treaties either extinguishing or recognizing the aboriginal title of a certain tribe of Indians.

In examining Article First and Article Third of

the Treaty of 1836, it is undeniable that the United States, in negotiating that treaty, recognized the aboriginal title of the Ottawa and the Chippewa in at least certain waters of the Great Lakes. For example, in the segment of Article Third quoted above, it is written that the Chippewas reserve certain territory "including the small islands and the fishing grounds, in front of this reservation". The fishing grounds referred to are in Lake Superior.

Moreover, the area described in Article First, that being the territory ceded by the Ottawas and the Chippewas to the United States, extends well into the Great Lakes.[7] For example, the ceded area is bounded in part by a line traveling from the mouth of the Thunder-bay river, "thence northeast to the boundary line *in Lake Huron* * * * thence northwestwardly, * * * *through the straits,* and river St. Mary's *to a point in Lake Superior* north of the mouth of *Gitchy Seebing,* or Chocolate river * * * " (emphasis added).

---

[7] Article One in its entirety reads as follows:

"The Ottawa and Chippewa nations of Indians cede to the United States all the tract of country within the following boundaries: Beginning at the mouth of Grand river of Lake Michigan on the north bank thereof, and following up the same to the line called for, in the first article of the treaty of Chicago of the 29th of August 1821, thence, in a direct line, to the head of Thunder-bay river, thence with the line established by the treaty of Saganaw of the 24th of September 1819, to the mouth of said river, thence northeast to the boundary line in Lake Huron between the United States and the British province of Upper Canada thence northwestwardly, following the said line, as established by the commissioners acting under the treaty of Ghent, through the straits, and river St. Mary's, to a point in Lake Superior north of the mouth of *Gitchy Seebing,* or Chocolate river, thence south to the mouth of said river and up its channel to the source thereof, thence, in a direct line to the head of the *Skonawba* river of Green bay, thence down the south bank of said river to its mouth, thence, in a direct line, through the ship channel into Green bay, to the outer part thereof, thence south to a point in Lake Michigan west of the north cape, or entrance of Grand river, and thence east to the place of beginning, at the cape aforesaid, comprehending all the lands and islands, within these limits, not hereinafter reserved." (See Map II.)

While we have no difficulty in concluding that the aboriginal title of the Indians did in fact extend into the Great Lakes, contrary to the allegations of the people, we cannot conclude that the Chippewas *alone* had aboriginal title in the *entire* area described in Article First of the Treaty of 1836.

The difficulty is that two different Indian "nations" ceded the described territory to the United States, the Chippewas and the Ottawas. Unfortunately, it is not at all evident from the language of the treaty which ceded areas had been occupied by the Ottawas and which by the Chippewas.

In such a circumstance, the existence of aboriginal title in a particular Indian tribe becomes a question of fact involving a judicial determination that the tribe claiming such title occupied exclusively the territory at issue. *United States v Santa Fe P R Co, supra,* 314 US 339, 345. This determination is to be made with reference to the habits and modes of life of the Indian tribes involved. *Mitchel v United States,* 34 US (9 Pet) 711, 746; 9 L Ed 283 (1835).

In the instant case, it is not necessary to determine all the segments of the ceded area to which the Chippewas, as opposed to the Ottawas, had held aboriginal title. Defendant LeBlanc was arrested in Pendills Bay, a part of Whitefish Bay about 20 miles west of Sault Ste. Marie. Judge Lambros concluded that the Chippewas had retained fishing rights pursuant to their aboriginal title in Pendills Bay, and that conclusion is both reasonable and sufficient for this case.

The record developed at trial and the language of the Treaty of 1836 itself leave no doubt that Pendills Bay was part of that area of the Upper Peninsula that the Chippewas had long occupied exclusive of other tribes.

In this regard, for example, it is significant that evidence was presented at trial that the Indian legend of the genesis of the Chippewas tribe is rooted in the Sault Ste. Marie area. In that legend, a pair of cranes created by the great spirit chose the Sault Ste. Marie area as their nesting place because of the plentiful supply of fish to be found there. Upon coming to rest, the two cranes were transformed into a man and a woman who were the progenitors of the Chippewa clan in that area.[8]

The aboriginal title of the Chippewas in the area was recognized in the Treaty of June 16, 1820 where the Chippewas ceded to the United States 16 square miles on the St. Mary's River while reserving a "permanent reserve" and "perpetual fishing right" at the falls of St. Mary's.[9]

Finally, the aboriginal title of the Chippewas in the Pendills Bay area was recognized by the United States in the Treaty of 1836 itself. As noted above, Article Third of the Treaty of 1836 reserved certain areas for the Chippewas *alone*[10] which included a reservation encompassing Pendills Bay.[11] The location of this reservation was in obvious recognition of the long-standing occupancy of the Chippewas of this area.

It is little wonder then, that in the face of this,

---

[8] *See* district court transcript, pp 52–53. This legend is recited in *Indian Myths,* a book by Ellen Russel Emerson published in 1965 (Ross & Haines, Minneapolis).

[9] *See* Article 3 of the Treaty of 1820:

"The United States will secure to the Indians a perpetual right of fishing at the falls of St. Mary's, and also a place of encampment upon the tract hereby ceded, convenient to the fishing ground, which place shall not interfere with the defences of any military work which may be erected, nor with any private rights."

[10] Article Second of the Treaty of 1836 reserved certain territory for the Ottawas and Chippewas in common.

[11] *See* the quoted segment of Article Third on pp 49–50 of this opinion.

and other evidence, the people did not dispute at trial that the area in which defendant had been arrested had been Chippewa country at the time of the Treaty of 1836.

We thus conclude with the district court that the area in which defendant was arrested was territory in which the Chippewas had reserved fishing rights pursuant to the Treaty of 1836, and reject the people's argument to the contrary.

There remains, however, the people's second contention, *i.e.,* that any fishing rights reserved under Article Thirteen have been terminated pursuant to the phrase "until the land is required for settlement".

Undoubtedly this clause was intended to protect the right of non-Indians to settle in the ceded area without interference from Chippewas claiming "the usual privileges of occupancy", and has limited the rights of the Chippewas to hunt. However, the ceded water areas of the Great Lakes have obviously not been required for settlement, and therefore the fishing rights reserved by the Chippewas in these areas have not been terminated.

In sum then, we hold, in agreement with the district court and the Court of Appeals, that the Treaty of 1836, pursuant to Article Thirteenth reserved for the Chippewas fishing rights in the waters where defendant was arrested.

## B. Article Third of the Treaty of 1836.

Defendant LeBlanc has argued in the alternative before this Court that when arrested in Pendills Bay, he was within the Bay Mills Reservation, was thus exercising *on-reservation* fishing rights, and was therefore protected from the appli-

cation of the state regulations he has been convicted of breaking.[12]

This argument is grounded in Article Third of the Treaty of 1836 which established nine reservations for the Chippewas along the coast of the Great Lakes. One of the reservations created was a large area in the Upper Peninsula apparently including Pendills Bay. That reservation was created in Article Third as follows:

"ARTICLE THIRD. There shall also be reserved for the use of the Chippewas living north of the straits of Michilimackinac, the following tracts for the term of five years from the date of the ratification of this treaty, and no longer, unless the United States shall grant them permission to remain on said lands for a longer period, that is to say * * * A tract commencing at the mouth of the *Pississowining* river, south of Point Iroquois, thence running up said stream to its forks,

---

[12] We recognize that this argument was not raised or argued before the district court. It was raised for the first time by the defendant upon application for rehearing to the Court of Appeals.

Ordinarily, we do not consider legal theories not raised at trial. However, where, as here, the legal theory rests upon undisputed facts (*i.e.* defendant's arrest in Pendills Bay), the parties have had the opportunity to fully brief the legal issue involved (*i.e.* the continued validity of the reservations created in Article Third of the Treaty of 1836), and the reviewing court can reach a reasonable conclusion upon evidence contained in the record, the reviewing court may decide the issue in the interest of justice and judicial efficiency. As stated in *Dation v Ford Motor Co*, 314 Mich 152, 160–161; 22 NW2d 252 (1946): "The general rule that a question may not be raised for the first time on appeal to this Court is not inflexible. When consideration of a claim sought to be raised is necessary to a proper determination of a case, such rule will not be applied". *See also Felcoskie v Lakey Foundry Corporation*, 382 Mich 438, 442; 170 NW2d 129 (1969); *Dolske v Gormley*, 58 Cal 2d 513; 25 Cal Rptr 270; 375 P2d 174 (1962); *Panopulos v Maderis*, 47 Cal 2d 337; 303 P 2d 738 (1956); *In re Lee's Estate*, 49 Wash 2d 254; 299 P2d 1066 (1956).

In the instant case, it is necessary to determine whether defendant was on a reservation or not when arrested because it might affect the right of the state to regulate his fishing activity. *See,* for example, *Menominee Tribe v United States, supra; Kimball v Callahan,* 493 F2d 564 (CA 9, 1974); *Moore v United States,* 157 F2d 760 (CA 9, 1946), *cert den* 330 US 827; 67 S Ct 867; 91 L Ed 1277 (1947).

thence westward, in a direct line to the Red water
lakes, thence across the portage to the Tacquimenon
river, and down the same to its mouth, *including the
small islands and fishing grounds, in front of this
reservation.*" (Emphasis added.)[13]

Defendant argues that the portion of the reser-
vation created in the quoted language of Article
Third constituting the "fishing grounds in front of
this reservation" was not terminated after the five-
year period provided for, given the continued pres-
ence of the Chippewas in the area since the Treaty
of 1836 and that Article Third remain effective to
the extent that it established Pendills Bay as part
of the present-day Bay Mills Reservation.

We reject this argument and conclude that Pen-
dills Bay is not part of the Bay Mills Reservation.

Defendant is correct in stating that the United
States at least tacitly permitted the Chippewas to
remain on the reservations created in Article
Third of the Treaty of 1836 long after the five-year
period set out that provision. Evidence of this fact
is found in a letter written by George Manypenny,
Commissioner of Indian Affairs, on May 21, 1855
urging a new treaty:

"Firstly, as regards the Ottawas and Chippewas in
the State of Michigan, that I am of the opinion that an
officer or officers of this Department should be desig-
nated by the President, to negotiated *[sic]* with the
Indians, with a view of adjusting all matters now in an
unsettled condition; and making proper arrangements
for their permanent residence in that State.

\* \* \*

"It was anticipated that after a few years, these
Indians would remove southwest of the Mississippi,

---

[13] *See* Map II, the area numbered 7.

hence the provision of a home for them there, as per Article 8 of the treaty and the Senate's amendment thereto, *but they were not limited by the treaty to any time within which they should remove to avail of the homes thus provided.*

*"They have never emigrated west, but have continued to hold the reservations described in the 2d & 3d articles of the treaty which have accordingly been withheld from sale, to accommodate the Indians.*

"Measures should now be taken in my judgment to secure permanent homes to the Ottawas and Chippewas either on the reservations, or on other lands in Michigan belonging to the government * * * ." (Emphasis added.)

However, the permission to remain on the reservations created in Article Third of the Treaty of 1836 ended with the Treaty of 1855. In the Treaty of 1855, the United States, recognizing the failure of its removal policy, moved to create permanent homes for the Chippewas pursuant to Article One of that treaty as is indicated in the letter quoted above.

In accordance with Article One of the Treaty of July 31, 1855 and the Indian Appropriation Act of June 19, 1860 (12 Stat 58), the United States government purchased 527.85 acres of land within the area reserved in Article Third of the Treaty of 1836 from the Methodist Mission Society to be held in trust for the Chippewa Indians. This land, along with 1053.91 acres purchased in 1937 pursuant to Indian Reorganization Act, 48 Stat 984 (1934) constitutes the Bay Mills Reservation. Pendills Bay is about 10 miles west of the westernmost boundary of the Bay Mills Reservation.

In establishing new homes for the Chippewas pursuant to the Treaty of July 31, 1855, the United States terminated its permission to retain the reservations created in Article Third of the

Treaty of 1836, including the reservation apparently containing Pendills Bay.

We hold then, that Pendills Bay is not part of the present-day Bay Mills Reservation, and that defendant LeBlanc was not exercising an on-reservation fishing right when arrested.

### III—THE TREATY OF JULY 31, 1855

The people argue that any fishing rights reserved by the Chippewas in the Treaty of 1836 under Article Thirteenth were extinguished by the Treaty of 1855 pursuant to Article Three of that treaty.

The pertinent language from the Treaty of 1855 reads as follows:

"In view of the existing condition of the Ottowas and Chippewas, and of their legal and equitable claims against the United States, it is agreed between the contracting parties as follows:

\* \* \*

ARTICLE 3. *The Ottawa and Chippewa Indians hereby release and discharge the United States from all liability on account of former treaty stipulations,* it being distinctly understood and agreed that the grants and payments hereinbefore provided for are *in lieu and satisfaction of all claims, legal and equitable on the part of said Indians* jointly and severally against the United States, *for land, money or other thing guaranteed to said tribes* or either of them by the stipulations of any former treaty or treaties, excepting, however, the right of fishing and encampment secured to the Chippewas of Sault Ste. Marie by the treaty of June 16, 1820." (Emphasis added.)

It is the theory of the people that any fishing rights reserved under Article Thirteenth of the Treaty of 1836 constitute a "liability" or "claims

* * * for land, money or other thing" released in
Article Three of the Treaty of 1855.

The Court of Appeals found that such an inter-
pretation gave the treaty language "a meaning
wholly at odds with what appears to have been
intended by the parties to be encompassed within
the terms of this provision". 55 Mich App 684, 688;
223 NW2d 305 (1974). Moreover, the Court of
Appeals concluded that an interpretation which
strained to equate a reserved fishing right with a
liability or claim for land, money or other thing
would be completely at odds with the rules of
construction mandated by the United States Su-
preme Court in *Worcester v Georgia,* 31 US (6 Pet)
515; 8 L Ed 483 (1832), and by this Court in *People
v Jondreau, supra:*

"The language used in treaties with the Indians
should never be construed to their prejudice. * * * How
the words of the treaty were understood by this unlet-
tered people, rather than their critical meaning, should
form the rule of construction." 384 Mich 539, 544,
quoting from *Worcester v Georgia, supra.*

We fully agree with the Court of Appeals on this
issue. An examination of the minutes of the nego-
tiations preceding the Treaty of 1855 clearly indi-
cate that the interpretation of Article Three of
that treaty asserted by the people would conflict
not only with the rules of construction mandated
for Indian treaties, but also the clear intent of the
parties.

The Treaty of 1855 was negotiated within the
context of the failure of the removal policy of the
United States and the dissatisfaction of the Chip-
pewas and the Ottawas with the perceived failure
of the United States to fulfill certain promises
made.

The tenor of the treaty negotiations was set in the introductory remarks of the Commissioner of Indian Affairs, Hon. Geo. W. Manypenny:

"There were two delegations of Ottawas and Chippeways at Washington last winter, each making nearly the same enquiries concerning the affairs of their people. They each had the impression that there was unsettled business under the older treaties running back as far as 1795. * * * I directed the acting commissioner, when I left Washington from which place I have been absent four or five weeks, to examine & if he found any default in the fulfillment of the old treaties by Government, to advise me of it. The fact in relation to your business, accords with the fair presumption, because it is a fair presumption, that when the treaty of 1836 was made all questions, growing out of previous treaties, of an unsettled character, were adjusted. With this general remark I now say, that notwithstanding this fair presumption, if it shall appear that there is still anything actually due to you under the old treaties, you may rely upon my efforts to obtain it for you."

After listening to the inquiries and complaints of the Indians present, Agent Henry C. Gilbert responded on behalf of the United States as follows:

"Listen to me until I reply to your questions. We have talked a great deal today. What we could, we have answered & explained to you. But after all the interests you are here to take care of are in a small compass. I have examined the old treaties carefully & can find nothing in them that you are entitled to except, the amount of $1700 permanent annuity, referred to this morning. With that exception all your claims against the U. S. are based upon the treaty of 1836. And now I will state what we think is due to you under that treaty.

"1st. The sum of $200,000 for your reservations.

\*    \*    \*

"Then comes the sum of $20,000 reserved annuity, with the interest. Then there is the value of their improvements as appraised. There may be something due on that fund.

\*    \*    \*

"These are all the funds, on which anything remains unpaid in which you have any interest & the manner in which the gross amount shall be paid is one of the most important things we have come here to consider. Then there is the question in regard to lands. The Government is willing to provide you with homes & is willing that those homes shall be in the State of Michigan."

There is not the slightest indication in this portion of the negotiations, or in the minutes of the negotiations in their entirety, that the Treaty of 1855 would affect hunting or fishing rights reserved under the Treaty of 1836.

The same may be said of an excerpt of a letter sent by the Indian agents negotiating the Treaty of 1855 to the Acting Commissioner of Indian Affairs summarizing the impact of the treaty as follows:

"In consideration therefore of the difference of the value of the western lands, and the home now secured to the Indians in Michigan and in the release and discharge of the United States from all claims or demands on account thereof, or on account of removal thereto and subsistence, or an account of the claims for 'articles and equipments to each person' and also in discharge and full satisfaction of the $200,000 stipulated to be paid them in lieu of the reservations by the Senate's amendment to the 4th Article of the treaty of 1836, and in like discharge of the sum which has accumulated from the investment of the $1,000 per annum, provided for by the 4th article of the treaty aforesaid, and in discharge of the $1,700 permanent annuity due to the Ottawas and heretofore specifically alluded to; in fact, in lieu and satisfaction of all claims,

legal or equitable, on the part of said Indians jointly and severally against the United States for land, money or other things guaranteed to them or either of them by the stipulations of any former treaty or treaties (excepting the right of fishing and encampment secured to the Chippewas of Sault Ste. Marie by the treaty of June 16, 1820) the United States are to pay them or expend for their benefit, the sum of $534,400 in manner following, viz:— * * * ."[14]

While it is conceivable that the United States intended "claims * * * for other things" in the Treaty of 1855 to refer to fishing rights reserved by the Chippewas in the Treaty of 1836, such seems highly unlikely given the complete absence of any discussion of the termination of such rights in the treaty negotiations.

In any case, it is clear that the Chippewas and the Ottawas would not have *understood* Article Three of the Treaty of 1855 to terminate hunting and fishing rights reserved in the Treaty of 1836 given the absence of any mention of such prospect.

The Indian representatives present at the discussions preceding the Treaty of 1855 put their trust in the white men who represented the President of

---

[14] The special exclusion of the right of fishing and encampment secured in this letter and in Article Three of the Treaty of 1855 might be here explained.

The Chippewas in the Sault Ste. Marie area had long been concerned about maintaining access to their fishing site at St. Mary's Falls, for this site was not only a superb fishery, but also served as an ancestral burying ground. In recognition of this important area to the Chippewas, the United States guaranteed a "permanent" right to fish and encamp here in the Treaty of 1820. *See* fn 9, *supra*.

However, the fishing site and encampment were destroyed 23 years later when the St. Mary's ship canal was constructed, leading to demands for compensation by the Chippewas. *See* the letter from George H. Manypenny and Henry C. Gilbert, Commissioners, to the Department of the Interior, Office of Indian Affairs, dated August 7, 1855.

The controversy was not settled in the Treaty of July 31, 1855, as the quoted exclusion clause makes clear. A separate agreement, on August 2, 1855, dealt with this issue.

the United States, whom they referred to as "great
father," as is indicated by the following statements
found in the treaty minutes:

*"Pay bah, me, say* [one of the Chippewa representa-
tives]. I have listened to all that has been said. In
regard to this proposal I have the lost the light. As you
have listened to what the Chippeways say in regard to
this tax matter, we have the same views upon that
point. *You are wise. You know what is right. We
therefore present ourselves to you to take what you
regard best."* (Emphasis added.)

*      *      *

*"Pay bah, me, say.* I wish to say a few words more to
· my father *[i.e.* the Commissioner of Indian Affairs]. I
wish to tell him, what our older chiefs determined,
before I went to see him at Washington last winter.
Before we went we had council and consulted about the
treaties and about what we should ask of you, and we
all said we were ignorant like children, lost in the
woods that we knew not where to go nor how far it is to
the water or the prairie. And the chiefs in those meet-
ings said we are not anything, but the white man is like
a tall tree; he can see the prairie and the water over
everything afar off. He can look and behold all the
nations of the world. And we further said that we had
an agent now, whom we like, because he has treated us
well since he has been with us. *  *  * I speak the mind
of all the Indians and not mine own alone."

People such as these certainly would not have
expected the white men whom they perceived as
wise, trustworthy and concerned about their best
interest, to terminate important rights preserved
in the Treaty of 1836 without so much as mention-
ing such termination. Given, then, the rules of
construction mandating that a treaty should be
interpreted as the Indians understood it, and that
the language of the treaty should not be read to
the prejudice of the Indians, we will not strain the
language of Article Three of the Treaty of 1855 to

mean that reserved fishing rights pursuant to the Treaty of 1836 were terminated.

Our conclusion is buttressed by the directive of the United States Supreme Court that "the intention to abrogate or modify a treaty is not to be lightly imputed". *Menominee Tribe v United States, supra,* 391 US 404, 413.

## IV—THE AUTHORITY OF THE STATE TO REGULATE CHIPPEWA FISHING RIGHTS

Having determined that the Chippewa Indians reserved fishing rights in the waters where defendant was arrested pursuant to the Treaty of 1836, and that those rights survived the Treaty of 1855, we must now determine the proper scope of state regulation of these rights.

The scope of proper state regulation of off-reservation rights has been the subject of a good deal of controversy.[15] However, for purposes of this case, two important United States Supreme Court cases should be the focus of our attention, *Tulee v Washington,* 315 US 681; 62 S Ct 862; 86 L Ed 1115 (1942), and *Puyallup Tribe v Department of Game,* 391 US 392; 88 S Ct 1725; 20 L Ed 2d 689 (1968).

In *Tulee,* defendant, a Yakima Indian, was charged and convicted of catching salmon with a net without first having obtained a license. Defendant argued that a treaty between the United

---

[15] For the discussion of commentators on the scope of Indian fishing rights, *see* the following: Comment, *Indian Treaty Analysis and Off-Reservation Fishing Rights: A Case Study,* 51 Wash L Rev 61 (1975); R Johnson, *The State Versus Indian Off-Reservation Fishing: A United States Supreme Court Error,* 47 Wash L Rev 207 (1972); Comment, *Indian Law—State Regulation—Hunting and Fishing Rights,* 18 NYL Forum 442 (1972); Comment, *State Power and the Indian Treaty Right to Fish,* 59 Cal L Rev 485 (1971); Hobbs, *Indian Hunting and Fishing Rights,* 32 Geo Wash L Rev 504 (1964).

States and the Yakima tribe entitled him to fish without a license off the reservation in the areas specified by the treaty.

The Supreme Court agreed, holding that the state was without power to charge a Yakima Indian a fee for exercising his off-reservation treaty fishing rights.[16] 315 US 681, 684–685.

In *Puyallup Tribe,* the Department of Game of Washington brought suit against the Puyallup Indians seeking declaratory relief and an injunction. In the Treaty of Medicine Creek, the Puyallup's off-reservation fishing rights were expressed as follows:

"The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory * * * ."

The United States Supreme Court held as follows:

"[T]he right to fish at those respective places is not an exclusive one. Rather, it is one 'in common with all citizens of the Territory.' Certainly the right of the latter may be regulated. And we see no reason why the right of the Indians may not also be regulated by an appropriate exercise of the police power of the State.

---

[16] The holding of the Court was expressed as follows:

"Viewing the treaty in this light, we are of the opinion that the state is without power to charge the Yakimas a fee for fishing. A stated purpose of the licensing act was to provide for 'the support of the state government and its existing public institutions.' Laws of Washington (1937) 529, 534. The license fees prescribed are regulatory as well as revenue producing. But it is clear that their regulatory purpose could be accomplished otherwise, that the imposition of license fees is not indispensable to the effectiveness of a state conservation program. Even though this method may be both convenient and, in its general impact, fair, it acts upon the Indians as a charge for exercising the very right their ancestors intended to reserve. We believe that such exaction of fees as a prerequisite to the enjoyment of fishing in the 'usual and accustomed places' cannot be reconciled with a fair construction of the treaty. We therefore hold the state statute invalid as applied in this case." 315 US 681, 685.

The right to fish 'at all usual and accustomed' places may, of course, not be qualified by the State, even though all Indians born in the United States are now citizens of the United States. * * * But the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians." 391 US 392, 398.

*Tulee* and *Puyallup Tribe* establish the following when applied to the instant case.

First, since the defendant when arrested was exercising off-reservation fishing right pursuant to Article Thirteenth of the Treaty of 1836, the conviction for fishing without a commercial license cannot stand under the authority of *Tulee v Washington, supra.* Such was the holding of the Court of Appeals, and we affirm that court in its holding on this issue.

Second, defendant's conviction for fishing with an illegal device may stand only if the prohibition of the gill net as applied to the Chippewas meets the standards established in *Puyallup Tribe, supra.*

With regard to this second point, defendant LeBlanc asserts that *Puyallup Tribe* is distinguishable from the instant case in that the treaty in *Puyallup* provided for off-reservation fishing rights "in common with all citizens of the territory", which the treaty provision in the instant case contains no such stipulation.

We disagree. Article Thirteenth of the Treaty of 1836 provides: "The Indians stipulate for the right of hunting on the lands ceded, with the other usual privileges of occupancy, until the land is required for settlement". Even under the most liberal construction of this language, we cannot conclude that the rights reserved here were *exclu-*

*sive.* The proviso, "until the land was required for settlement", indicates that the interests and rights of the other citizens of the territory were to be taken into account. Moreover, the Treaty of 1836 had been negotiated with an awareness that statehood was soon forthcoming for Michigan. Michigan in fact became a state in 1837. Certainly then, the territory acquired from the Indians so as to facilitate statehood would not have been so heavily encumbered as to allow the treaty Indians the exclusive "privileges of occupancy".

Thus, in the instant case, as in *Puyallup Tribe, supra,* the Indians hold their off-reservation fishing rights in common with the citizens of the State of Michigan.[17]

Given the applicability of *Puyallup Tribe, supra,* we must remand the second charge to the district court for a determination of whether the prohibition of gill nets as applied to the Chippewas passes muster under the standards of that case. The difficulty in this regard is divining precisely what the state is required to show to successfully defend the constitutionality of its regulation.

The recent case of *Antoine v Washington,* 420 US 194; 95 S Ct 944; 43 L Ed 2d 129 (1975), helped clarify the standards established in *Puyallup Tribe.* In *Antoine,* defendant Indians appealed a conviction for hunting and possession of deer during the closed season in an area of a former Indian reservation that the tribe had ceded to the govern-

---

[17] This does not imply that the Chippewas are in the same position as all other citizens of Michigan with regard to their fishing rights. The sources of the fishing rights of Chippewas and the rest of the citizenry of Michigan are different, and as stated in *Puyallup Tribe,* "[t]o construe the treaty as giving the Indians 'no rights but such as they would have without the treaty' (198 US 380) would be 'an impotent outcome to negotiations and a convention, which seemed to promise more and give the word of the Nation for more.' " 391 US 392, 397. *See also Antoine v Washington, infra.*

ment. In discussing the power of the state to regulate the hunting rights of the Indians, the United States Supreme Court construed *Puyallup Tribe* as follows:

"In *Puyallup I, supra,* at 398, we held that although the rights 'may * * * not be qualified by the State * * * the manner of fishing [and hunting], the size of the take, the restriction of commercial fishing [and hunting], and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians.' The 'appropriate standards' requirement means that the State must demonstrate that its regulation is a reasonable and necessary conservation measure [citations omitted] *and* that its application to the Indians is necessary in the interest of conservation." 420 US 194, 207.

Thus, under *Antoine v Washington,* the question in the instant case becomes, first, whether the prohibition of gill nets is a reasonable and necessary conservation measure, *and* second, whether the prohibition of the use of gill nets *by the Chippewas* is necessary in the interest of conservation.[18]

A recent Ninth Circuit opinion, *United States v Washington,* 520 F2d 676 (CA 9, 1975), is significant in that it helped define when a state regulation is necessary for conservation and when such regulation was discriminatory.

In *Washington,* the United States brought suit against the State of Washington to enforce the state's compliance with certain treaties between

___

[18] In defining "appropriate standards" in these terms, the United States Supreme Court apparently rejected the approach of the Ninth Circuit in *Maison v Confederated Tribes,* 314 F2d 169 (CA 9, 1963), where it was held that the state regulation was required to be indispensable for conservation.

the United States and various tribes of western
Washington.

The Court first held that a state regulation was
serving conservation of fish under *Puyallup Tribe*
only if the regulation served to perpetuate the fish
to be protected.[19]

Moreover, the court held that the state cannot
discriminate against the treaty Indians by forcing
treaty Indians to yield their own protected inter-
ests in order to promote the welfare of the state's
other citizens. Direct regulation of treaty Indian
fishing rights is permissible only after the state
has proven that it cannot serve conservation by
regulating the rights of citizens not possessing
treaty fishing rights.[20] 520 F2d 676, 686.

See also *Sohappy v Smith,* 302 F Supp 899 (D
Or, 1969), for an example of another case taking
the approach used in *United States v Washington,
supra.*

Finally, in 1971, this Court was confronted with
the question of the scope of the state's authority to
regulate Indian off-reservation fishing rights in
*People v Jondreau,* 384 Mich 539; 185 NW2d 375

---

[19] In *United States v Washington, supra,* the fishing sites involved
were on a river. The state proposed a definition of conservation
encompassing three objectives: 1) to allow sufficient escapement of fish
to perpetuate the fish run; 2) to assure the maximum sustained
harvest of fish; and 3) to provide for an orderly fishery.

The court rejected the proposed definition as follows:

"[T]he only rationale for permitting state interference with Indian
fishing precludes adoption of this definition and restricts the meaning
of conservation to insuring optimum spawning escapement for perpet-
uation of the run. 'Rights can be controlled by the need to conserve a
species.' *Department of Game of Washington v Puyallup Tribe (Pu-
yallup II)* 414 US 44, 49; 94 S Ct 330, 334; 38 L Ed 2d 254 (1973)." 520
F2d 676, 686.

[20] As noted above this case dealt with fish runs in a river, which
necessitated the equitable apportionment of the opportunity to fish in
order to protect the rights of the treaty Indians and the other citizens
of Washington, 520 F2d 676, 687–88. Such apportionment may not be
a necessary consideration in the circumstances of this case.

(1971). In this case, defendant Jondreau, a Chippewa Indian, was arrested for possession of trout out of season. Noting that *Puyallup Tribe, supra,* provided that the state could provide for regulation of off-reservation fishing rights which were reasonably necessary for the conservation of fish, we held that the regulation of the time in which the Chippewas exercised their fishing rights was not a valid application of state power, particularly in view of the fact that the treaty in question specifically provided a mechanism for Federal regulation of the fishing rights of the Chippewas.

In the light of these cases, we conclude that on remand, the district court should uphold defendant's conviction for fishing with an illegal device only if:

1) the prohibition of the gill net is necessary for the preservation of the fish protected by the regulation;

2) the application of this prohibition to the Chippewas is necessary for the preservation of the fish protected;

3) and the regulation does not discriminate against the Chippewas.

## V—CONCLUSION

We affirm the Court of Appeals reversal of defendant LeBlanc's conviction for fishing without a commercial license. We also affirm the Court of Appeals remand to the district court on the charge of fishing with an illegal device. The determination on remand of whether the application of the state prohibition against gill nets to the Chippewas is valid should be made in accordance with the standards set out in this opinion.

KAVANAGH, C. J., and LEVIN and FITZGERALD, JJ., concurred with WILLIAMS, J.

Map I

RESERVATIONS OF THE OTTAWA AND CHIPPEWA OF MICHIGAN
TREATY OF MARCH 28, 1836

LINDEMER, J. *(dissenting).* With Justice WILLIAMS
we agree that the Treaty of 1836 granted the
Chippewa Indians the right to fish in Pendills Bay.

We cannot conclude, however, that that treaty
secured that right indefinitely. The rights arising
under Article Third were limited "for the term of
five years from the date of ratification of this
treaty, and no longer, unless the United States
shall grant them permission to remain on said

lands for a longer period". We are in agreement with Justice Williams that those rights were extinguished by the Treaty of July 31, 1855.

In like manner, the rights established by Article Thirteenth were limited by the language "until the land is required for settlement". Our understanding that these rights were meant to be temporary is also supported by the language of Article Eighth.

"It is agreed, that as soon as the said Indians desire it, a deputation shall be sent to the southwest of the Missouri River, there to select a suitable place with the final settlement of said Indians, which country, so selected in reasonable extent, the United States will forever guaranty and secure to said Indians. * * * When the Indians wish it, the United States will remove them, at their expense, provide them a year's subsistance in the country to which they go, and furnish the same articles and equipments to each person as are stipulated to be given to the Pottowatomies in the final treaty of cession concluded at Chicago."

Article Eighth is a reflection of the United States' policy of removing Indians from their native lands in order to make available new territories for white settlements and to avoid conflicts between Indians and settlers. In light of the Federal government's removal policy and those limitations placed in the treaty, we must conclude that the fishing rights secured under the Treaty of 1836 were temporary in nature and meant to expire in a short time.

Article Thirteenth fishing rights arise from the language "usual privileges of *occupancy,* until the *land* is required for settlement". In our opinion, Article Thirteenth is susceptible of only one interpretation, that is, settlement of the *land* terminates all usual privileges of occupancy associated with the land. In construing Article Thirteenth to

include the right to fish we had to conclude that
fishing was a usual privilege of occupancy of land.
To hold that "the ceded water areas of the Great
Lakes have obviously not been required for settle-
ment, and therefore the fishing rights reserved by
the Chippewas in these areas have not been termi-
nated" is logically inconsistent and strains the
treaty language beyond the breaking point. We
seriously doubt that the Chippewas would have
understood the term "usual privileges of occu-
pancy" to have two different meanings. Nor, con-
sidering the Indians' way of life, do we believe that
the Chippewas would have thought that the privi-
lege of fishing in a body of water could be sepa-
rated from the privilege of using the land sur-
rounding or abutting it.

We further conclude that Article 3 of the Treaty
of July 31, 1855, extinguished any fishing rights
that existed pursuant to Article Thirteenth of the
Treaty of 1836. Article 3 reads:

"The Ottawa and Chippewa Indians hereby release
and discharge the United States from all liability on
account of former treaty stipulations, it being distinctly
understood and agreed that the grants and payments
hereinbefore provided for are in lieu and satisfaction of
all claims, legal and equitable on the part of said
Indians jointly and severally against the United States,
for land, money or other thing guaranteed to said tribes ·
or either of them by the stipulations of any former
treaty or treaties, excepting, however, the right of
fishing and encampment secured to the Chippewas of
Sault Ste. Marie by the Treaty of June 16, 1820."

We wholeheartedly agree with the circuit jud-
ge's opinion in that "[s]ince the Treaty of July 31,
1855 specifically provided that grants and pay-
ments were in lieu and satisfaction of all claims
for land, money or other thing guaranteed by the

'stipulations' of any former treaty, it is difficult to conceive how it could have been made more clear that any special right provided for in a 'stipulation' in the treaty of 1836 was canceled".

The Treaty of July 31, 1855, reflects a marked departure from the policy of removal of the 1836 treaty. The Treaty of 1855 provides for the dissolution of the tribal structure of the Chippewa, sums of money and individual allotments of land to individual Indians, and assistance in the settlement and assimilation of the Chippewa into their new life style as settlers. It provides them with schools, blacksmith shops, agricultural implements, carpenter's tools, household furniture, building materials and cattle.

In *Tulee v Washington,* 315 US 681; 62 S Ct 862; 86 L Ed 1115 (1942), the United States Supreme Court examined the negotiations preceding the treaty agreement therein reached and was "impressed by the strong desire the Indians had to retain the right to hunt and fish in accordance with the immemorial customs of their tribes". 315 US at 684. Here, we have examined the treaty negotiations and find they are bereft of any mention of fishing rights, immemorial or otherwise. Rather, both parties anticipated that the Chippewa were no longer to live as they historically had.

That the Chippewa were to adopt the life style of the citizens of Michigan is indicated not only by the language of the treaty, but also by the expressed anticipations of both parties during the treaty negotiations. Indian agent Henry C. Gilbert told the Indians that it was the object of the government "to induce you to settle upon the soil, & procure a livelihood by agriculture". The Indi-

ans expressed great concern in selecting the lands
they were to receive and securing good title to
those lands. As-sa-gon, an Indian negotiator, ob-
served that many of his native lands were not
good. He added:

"Much of them are heavy and swampy & we must
select only such as are good for agriculture."

Another Indian negotiator, Was-son, remarked:

"We have all come to the question in regard to the
lands. We know our great father will give us these
lands for a homestead. I have abandoned the woods for
a maintenance & am now a farmer. I no longer go into
the woods & look for wild animals when I want to eat;
but I kill one of the cattle I raise for myself."

Was-son's remarks were the only reference to
hunting or fishing during the treaty negotiations.

The Chippewa clearly expected that they were
to be assimilated into the white society. As-sa-gon
expressed concern over the slow progress of the
Indian children in learning the English language
and requested that more competent schoolmasters
be hired. Mene-a-du-pe-na-se asked that additional
educational funds be earmarked for college tuition
for the Indian boys.

The intent of both parties was to plan for the
future in light of present realities. "We are", As-
sa-gon stated, "now acting for our children". The
future contemplated was an end to the traditional
life style of the Chippewa. The reason no hunting
or fishing rights were retained by the treaty was
that such rights were not intended to be retained.

We would affirm the convictions.

Coleman, J., concurred with Lindemer, J.

Ryan, J. *(dissenting)*. I agree that the "usual

privileges of occupancy" referred to in Article Thirteenth of the Treaty of 1836 included the right to fish in the abutting waters of Lake Superior. However, I concur with Justice LINDEMER that Article Thirteenth must be interpreted to mean that "settlement of the *land* terminates all usual privileges of occupancy associated with the land". It being manifest that the land in Michigan's Upper Peninsula is required for settlement, the fishing rights acquired under the treaty are extinguished.

However, I cannot subscribe to my Brother's second conclusion because I agree with Justice WILLIAMS that the decisions of the United States Supreme Court regarding the construction of Indian treaties requires us to conclude on this record that the Treaty of July 31, 1855 did not extinguish any of the fishing rights granted the Chippewas in the Treaty of 1836.

I would affirm the convictions.